181 P.3d 831 (2008)
STATE of Washington, Respondent,
v.
Phillip Victor HICKS, Petitioner.
State of Washington, Respondent,
v.
Rashad Demetrius Babbs, Petitioner.
No. 79143-1.
Supreme Court of Washington, En Banc.
April 24, 2008.
*833 David Bruce Koch, Nielsen Broman & Koch PLLC, Rita Joan Griffith, Seattle, WA, for Petitioners.
Pierce County Prosecutor's Office, Kathleen Proctor, Tacoma, WA, for Respondent.
Kathryn C. Loring, Skinner & Saar PS, Friday Harbor, WA, Nicholas Peter Gellert, Julia Parsons Clarke, Perkins Coie LLP, Sarah A. Dunne, Nancy Lynn Talner, ACLU, Seattle, WA, for Amicus Curiae on behalf of American Civil Liberties Union.
J.M. JOHNSON, J.
¶ 1 Phillip Hicks and Rashad Babbs were convicted at two separate trials for the murder of Chica Webber (first trial) and the attempted murder of Jonathan Webber (second trial). We must determine whether their defense counsel was ineffective in informing potential jurors that the case was noncapital and in not objecting to the trial court and prosecution doing the same. We must also decide whether the trial court erred in denying the defendants' Batson[1] challenge to the exclusion of the only remaining African-American juror on the venire.
¶ 2 We hold that under our current precedent, informing the jury that the case is noncapital and failing to object to the trial court and prosecution doing the same, is deficient performance of counsel. In this case, the error was nonprejudicial. We additionally hold that the trial court's denial of the Batson challenge was not clearly erroneous. For reasons stated, we affirm the convictions.

FACTS AND PROCEDURAL HISTORY
¶ 3 On the night of March 21, 2001, two men approached Jonathan Webber and his wife Chica as they were walking from a friend's house and asked the couple if they had drugs. The Webbers told the men that they did not and kept walking. The two men followed the Webbers, demanding several times that they empty their pockets. The Webbers continued walking, and the two men started shooting at them. Jonathan[2] sustained wounds to his leg, wrist, and the left side of his back, but survived. Chica died. The autopsy of Chica's body revealed that she had been shot three times in the head  twice by a .22 revolver and once by a 9 mm handgun. Jonathan and another witness, Wayne Washington, also testified that the shots came from two firearms. Jonathan identified Hicks in a photomontage as one of *834 his assailants but was unable to identify Babbs as the second assailant.
¶ 4 After the attack, the shooters ran off through an alley. A search of the area recovered a .22 revolver, a brown glove, a black leather jacket, a knit stocking cap, and a sweatshirt. The sweatshirt had DNA (deoxyribonucleic acid) that later testing found to be consistent with Babbs's DNA. The jacket also contained items linked to Babbs's sister and cousin.
¶ 5 On the night of the shooting, a man not wearing a jacket pounded on the window of Dana Duncan. Duncan did not know the man, but he convinced her he knew her brother. She gave the man a ride to another part of town. Shortly after Duncan arrived home, she received a thank you call from a cell phone linked to Babbs. Duncan first had difficulty identifying Babbs but eventually testified that Babbs was the man who had come to her window.
¶ 6 On April 24, 2001, the police arrested Hicks for unrelated drug dealing charges. Hicks made statements implicating himself in the Webber shootings both before and after he was read his Miranda[3] warnings.
¶ 7 For Chica's death, the State charged Hicks and Babbs with aggravated first degree murder and in the alternative, first degree intentional murder and first degree felony murder, with first or second degree robbery as the underlying felony. The State also charged Hicks and Babbs with attempted murder of Jonathan and unlawful firearm possession. Babbs pleaded guilty to the firearm charge before trial.
¶ 8 At the first trial during voir dire, juror nine expressed concern that her religious beliefs might interfere with her ability to decide the case. When the trial judge asked her to think of an area where her church's teachings might conflict with her jury service, she mentioned capital punishment. After a sidebar with the attorneys, the trial court informed the jury that "[t]his is not a death penalty case. So that issue is one that I suppose could come in conflict with your religious beliefs, but it is not one that is at issue in this case. So that may remove some of your problem." Verbatim Report of Proceedings (VRP) (Apr. 22, 2003) at 74-75. There was no objection on the record from counsel. Juror nine then stated she could follow the law as given to her.
¶ 9 Later during voir dire, the prosecutor asked juror nine whether she would feel uncomfortable having to make a decision about the guilt or innocence of another human being. The juror responded, "No. I feel I try not to make a mistake, because . . . some people were executed, then they found out they were innocent afterwards." Id. at 155. The prosecutor then confirmed that because capital punishment was not an issue, juror nine was eligible to serve.
¶ 10 Both the defense and the prosecution referenced the nonapplicability of the death penalty on a few more occasions during voir dire. When counsel for Hicks reminded jurors that the case did not involve the death penalty, the prosecutor objected, and the trial court instructed the venire members that they should not consider punishment except to make them careful. Later, juror 33 said, "I recall it was a law professor that said to me in a conversation we had, he says, `I'd rather see 10 guilty people on the street than one innocent person in the electric chair.'" VRP (Apr. 23, 2003) at 63-64. Counsel for Babbs responded, "Okay. All right. Again, we are not heading toward the death penalty in this case, but I understand." Id. The juror responded, "Right. Of course." Id. The State dismissed juror 33, but the remaining jurors had all been present for this exchange on the death penalty. Additionally, during closing argument, the trial deputy also alluded to the case being noncapital. Contrasting Hicks's situation with decedent Chica's, she told jurors, "at least he has a life. At least he can choose whether or not he's going to grow old to a ripe old age. He can choose whether he wants to see his friends or his family." VRP (May 12, 2003) at 31.
¶ 11 The jury convicted Hicks and Babbs of first degree felony murder of Chica. The jury also convicted Hicks of the firearm charge. The jury could not reach a verdict *835 on the attempted murder charges. Consequently, after a two day impasse, the trial court declared a mistrial on those charges.
¶ 12 A second trial was held on the attempted murder charges. During the jury voir dire, counsel for Hicks and Babbs both objected when the State used a peremptory challenge to remove juror nine, the only remaining African-American juror from the venire. (Juror 17, another African-American juror was challenged for cause because he knew many of the witnesses and thought this knowledge would impact his assessment of their credibility, and juror 54, also African-American, fell ill and did not return.) Defense counsel argued that, because the prosecutor had not asked this juror any questions,[4] race must have been the reason for removing her. After a discussion with counsel regarding the Batson three-part test, the trial court determined, "[O]ut of an abundance of caution, I find a prima facie case [of discrimination]." 5 VRP (Jan. 30, 2004) at 496. The prosecutor then offered his reasons for exercising the challenge:
[The juror] has a master's in education. Whether it's science or not, people who are educators tend to be non-state type jurors that tend to be more forgiving, nurturing types, that necessarily aren't going to look for reasons to excuse behavior. She also happens to be a social worker, which is another red flag for a prosecutor.
. . . .
Further, [the juror] also indicated that somebody in her family, either a friend or relative, has been arrested and served time.
Id. at 496-97.
¶ 13 In response, the trial court remarked, "[h]e must have read the same version of the jury selection book that's been on my shelf for years." Id. at 497. The defense counsel reminded the court that the final step of Batson required the trial court's determination. After the prosecution's reiteration of his reasons for the strike, the court said "Okay. The Batson challenge is denied." Id. at 497-98. The jury at the second trial convicted Hicks and Babbs of attempted murder of Jonathan.
¶ 14 Hicks and Babbs appealed their convictions for first degree felony murder, attempted murder, and unlawful possession of a firearm. They contended that they received ineffective assistance of counsel in their first trial because their attorneys informed the jury that the case was noncapital and failed to object to the trial court and prosecution doing the same, and that this information was prejudicial.
¶ 15 Additionally, Hicks and Babbs claimed that the trial judge in their second trial erred in denying their Batson challenge. They contended that the judge failed to perform the third step of Batson's three-part analysis. They argued that even though the prosecutor's reasons for excusing the only remaining African-American juror were race-neutral, they were clearly pretextual.
¶ 16 On appeal, the Court of Appeals affirmed all convictions. Although the court found that the defense counsel's performance was deficient insofar as they did not object to the trial court informing the jury that the case was noncapital, the court held that the error was nonprejudicial because Hicks and Babbs failed to show that the trial outcome would likely have differed.
¶ 17 The Court of Appeals also upheld the trial court's denial of the Batson challenge. The court did not address whether the trial court properly performed Batson's third step or whether the prosecutor's offered reasons were pretextual. Instead, the court addressed the trial court's finding of a prima facie case. The Court of Appeals held that because defense counsel never established a prima facie case, the trial court did not err in denying the Batson challenge.

STANDARD OF REVIEW
¶ 18 The appellate test for ineffective assistance of counsel is "whether, after examining the whole record, the court can conclude that appellant received effective representation and a fair trial." State v. Ciskie, 110 Wash.2d 263, 284, 751 P.2d 1165 (1988).
*836 ¶ 19 In reviewing a trial court's ruling on a Batson challenge, "[t]he determination of the trial judge is `accorded great deference on appeal,' and will be upheld unless clearly erroneous." State v. Luvene, 127 Wash.2d 690, 699, 903 P.2d 960 (1995) (quoting Hernandez v. New York, 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)).

ANALYSIS
A. Defendants Received Effective Assistance of Counsel
¶ 20 We have adopted the two-part Strickland[5] test to determine whether a defendant had constitutionally sufficient representation. State v. Cienfuegos, 144 Wash.2d 222, 226, 25 P.3d 1011 (2001). First, the "`defendant must show that counsel's performance was deficient.'" Id. (quoting Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). To establish deficient performance, a defendant must "demonstrate that the representation fell below an objective standard of reasonableness under professional norms. . . ." State v. Townsend, 142 Wash.2d 838, 843-44, 15 P.3d 145 (2001). Second, the "`defendant must show that the deficient performance prejudiced the defense.'" Cienfuegos, 144 Wash.2d at 227, 25 P.3d 1011 (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052). This requires the defendant to prove that, but for counsel's deficient performance, there is a "reasonable probability" that the outcome would have been different. Id.
1. Precedent in this Court Supports Finding That Counsel's Performance Was Deficient
¶ 21 In Townsend, 142 Wash.2d at 840, 15 P.3d 145, this court held that it is error to inform the jury during the voir dire in a noncapital case that the death penalty is not involved. In Townsend, the trial court at the prosecutor's request, instructed the jury "`[t]his is not a case in which the death penalty is involved and will not be a consideration for the jury.'" Id. at 842, 15 P.3d 145 (quoting Suppl. Partial Report of Proceedings at 2). We reasoned that where the jury has no sentencing function, it should not be informed on matters that relate only to sentencing. Id. at 846, 15 P.3d 145. We found "[t]his strict prohibition against informing the jury of sentencing considerations ensures impartial juries and prevents unfair influence on a jury's deliberations." Id.
¶ 22 In Townsend, we also rejected the argument that revealing this information was part of a legitimate tactic, reasoning that "[t]here was no possible advantage to be gained by defense counsel's failures to object to the comments regarding the death penalty. On the contrary, such instructions, if anything, would only increase the likelihood of a juror convicting the petitioner." Id. at 847, 15 P.3d 145. We further noted "if jurors know that the death penalty is not involved, they may be less attentive during trial, less deliberative in their assessment of the evidence, and less inclined to hold out if they know that execution is not a possibility." Id.
¶ 23 Recently, in State v. Mason, 160 Wash.2d 910, 929, 162 P.3d 396 (2007), we also declined to recognize a distinction between a court or counsel-initiated and a juror-initiated discussion of the inapplicability of the death penalty. Thus, under our precedent, in response to any mention of capital punishment, the trial judge should state generally that the jury is not to consider sentencing.[6]
¶ 24 Applying both Townsend and Mason, we hold that the defense counsel's performance was deficient insofar as counsel informed the jury that the case was noncapital and failed to object when the trial court and prosecution made similar reference.
2. Counsel's Deficient Performance Was Not Prejudicial
¶ 25 Proving that counsel's deficient performance prejudiced the defense "requires *837 showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S at 687, 104 S.Ct. 2052.
¶ 26 In the instant case, there is no showing that the defendants were deprived of a fair trial or that the trial outcome likely would have differed. There is no indication that the jurors failed to take their duty seriously. In declaring a mistrial on the attempted murder charges, the trial court particularly noted the active deliberation of the jury.[7] There is also abundant evidence in the record to support the conviction of both Hicks and Babbs. A guilty verdict was likely even if the jury had not been informed that the case was noncapital. Most notably, a different jury in the second trial on the attempted murder charge, with no mention of the death penalty, found the evidence convincing enough to identify and convict both Hicks and Babbs as the shooters.
¶ 27 Moreover, since Hicks and Babbs were not convicted by the first jury of the most serious charges (aggravated murder concerning Chica and attempted murder concerning Jonathan), the harm feared in Townsend that a jury might be more likely to convict was not manifest. We find defense counsel's deficient performance in this case nonprejudicial.
B. The Trial Court's Denial of the Batson Challenge Was Not Clearly Erroneous
1. Federal law governing Batson
¶ 28 In Batson v. Kentucky, 476 U.S. 79, 86, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court declared that "[t]he Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race." Batson outlines a three-part process to determine whether a prosecutor has excluded a juror based on race. First, the challenger must "make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Id. at 93-94, 106 S.Ct. 1712. Second, "the burden shifts to the State to come forward with a neutral explanation for challenging" the juror. Id. at 97, 106 S.Ct. 1712. And third, "[t]he trial court then [has] the duty to determine if the defendant has established purposeful discrimination." Id. at 98, 106 S.Ct. 1712.
¶ 29 The Batson Court further outlined the requirements of a prima facie case. To establish a prima facie case, the challenger "first must show that he is a member of a cognizable racial group." Id. at 96, 106 S.Ct. 1712. Second, the defendant "must show that these facts and any other relevant circumstances raise an inference" that the prosecutor used a peremptory challenge to exclude a potential juror from the jury on account of the juror's race. Id.
¶ 30 Although the Supreme Court has provided some elucidation on this three-part process since Batson, the Court has also recognized that the states have flexibility in the procedure for applying the Batson test. Johnson v. California, 545 U.S. 162, 168, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005); Batson, 476 U.S. at 99, 106 S.Ct. 1712 ("We decline . . . to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges."). Lower courts have been entrusted with the task of determining the type and amount of proof necessary for a defendant to establish a prima facie case of discrimination.
2. Washington's Application of Batson
a. A Trial Court May in its Discretion Find a Prima Facie Case Based on Removal of the Sole Remaining Venire Person from a Constitutionally Cognizable Group
¶ 31 The parties and the Court of Appeals focus on three cases that have addressed *838 whether excusing the only remaining African-American in the jury venire is sufficient to make out a prima facie case of discrimination. Although the Court of Appeals relied on State v. Evans, 100 Wash.App. 757, 998 P.2d 373 (2000),[8] and State v. Wright, 78 Wash.App. 93, 896 P.2d 713 (1995) in its ruling, and specifically rejected State v. Rhodes, 82 Wash.App. 192, 917 P.2d 149 (1996),[9] a closer look at these three cases shows that they actually articulate the same standard: trial courts are not required to find a prima facie case based on the dismissal of the only venire person from a constitutionally cognizable group, but they may, in their discretion, recognize a prima facie case in such instances.
¶ 32 Hicks and Babbs cite decisions from other jurisdictions that have similarly found that striking the sole remaining African-American, Hispanic, or Native American juror may be sufficient for a prima facie case under Batson.[10] This seems consistent with the Supreme Court's concern in Batson. The Batson Court noted that "`a consistent pattern of official racial discrimination' is not `a necessary predicate to a violation of the Equal Protection Clause'" and that "`[a] single invidiously discriminatory governmental act' is not `immunized by the absence of such discrimination in the making of other comparable decisions.'" 476 U.S at 95, 106 S.Ct. 1712 (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 n. 14, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). The Court further declared that "[f]or evidentiary requirements to dictate that `several must suffer discrimination' before one could object would be inconsistent with the promise of equal protection to all." Id. at 95-96, 106 S.Ct. 1712 (citation omitted).
¶ 33 The Batson Court also declared that "[w]e have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." Id. at 97, 106 S.Ct. 1712.
¶ 34 Here, the trial judge was well within his discretion when he determined, "[O]ut of an abundance of caution, I find a prima facie case [of discrimination]." 5 VRP (Jan. 30, 2004) at 496. Not only was juror nine the only remaining African-American venire member, but both Hicks and Babbs are African-American, and the prosecution failed to orally question juror nine about all reasons for which he dismissed her. Lack of questioning prior to dismissing a juror can be evidence that the removal is race-based. See, e.g., Miller-El v. Dretke, 545 U.S. 231, 246, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("`[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.'" (Ex parte Travis, 776 So.2d 874, 881 (Ala. 2000))). The facts were sufficient for the trial court to find an inference of discrimination.
¶ 35 In a brief in support of the defendants, amicus American Civil Liberties Union emphasizes that this court has found that the Washington Constitution provides greater protection for jury trials than is provided in the federal constitution. See, e.g., City of Pasco v. Mace, 98 Wash.2d 87, 99, 653 P.2d 618 (1982). Article I, section 21 states, "The right of trial by jury shall remain inviolate. . . ." In interpreting "inviolate," this court has relied on Webster's definition: "`free from change or blemish: PURE, UNBROKEN . . . free from assault or trespass: UNTOUCHED, INTACT.'" State v. Smith, 150 Wash.2d 135, 150, 75 P.3d 934 (2003) *839 (quoting Webster's Third New International Dictionary 1190 (1993)).
¶ 36 The increased protection of jury trials under the Washington Constitution further supports allowing the trial judge, in his discretion, to find a prima facie case of discrimination when the State removes the sole remaining venire person from a constitutionally cognizable group.
b. Whether Defendants Established a Prima Facie Case Is Not Necessary To Decide on Review
¶ 37 In Hernandez, the Court declared that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." 500 U.S. at 359, 111 S.Ct. 1859. We have similarly held that "if . . . the prosecutor has offered a race-neutral explanation and the trial court has ruled on the question of racial motivation, the preliminary prima facie case is unnecessary." Luvene, 127 Wash.2d at 699, 903 P.2d 960 (citing Hernandez, 500 U.S. at 359, 111 S.Ct. 1859).
¶ 38 In the instant case, where the trial court found a prima facie case "out of an abundance of caution," the prosecutor offered a race-neutral explanation, and the trial court properly ruled, whether a prima facie case was established does not need to be determined. 5 VRP (Jan. 30, 2004) at 496. A reviewing court should focus its deferential review on the trial court's ultimate ruling on the Batson challenge. The discussion of a prima facie case, supra, is included only to clear up confusion among the lower courts.
c. The Trial Court's Denial of the Batson Challenge Was Not Clearly Erroneous
¶ 39 Courts afford a high level of deference to the trial court's determination of discrimination. In Hernandez, the Supreme Court noted that "[d]eference to trial court findings on the issue of discriminatory intent makes particular sense in this context because . . . the finding `largely will turn on evaluation of credibility.' 476 U.S. at 98 n. 21, 106 S.Ct. 1712. . . . As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies `peculiarly within a trial judge's province.' Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)." 500 U.S. at 365, 111 S.Ct. 1859. And in Miller-El v. Cockrell, 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), the Court declared, "[d]eference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations."
¶ 40 Although defendants contend that the trial judge's prompt ruling of "Okay. The . . . challenge is denied" illustrates a failure to perform the third step of the Batson process, the record does not support this contention. 5 VRP (Jan. 30, 2004) at 498. The Supreme Court stated in Hernandez, "[t]he analysis set forth in Batson permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process." 500 U.S. at 358, 111 S.Ct. 1859. Although more articulation of a trial judge's findings is always helpful on appellate review, the court here carefully followed the Batson analysis as outlined in Evans and provided sufficient explanation for his denial of the Batson challenge. The record indicates that the trial judge found defense counsel's prima facie case weak and the prosecutor's explanation for juror nine's dismissal credible and in accordance with common jury selection considerations. Many lawyers maintain strong viewpoints that individuals in certain professions or occupations tend to be unfavorable jurors. The trial judge recognized the prevalence of such beliefs with his response to the prosecutor's explanation for juror nine's removal: "[h]e must have read the same version of the jury selection book that's been on my shelf for years." 5 VRP (Jan. 30, 2004) at 497. While dismissing teachers or social workers from jury service may be based upon generalizations about the type of persons engaged in those professions, such challenges are not race- or gender-based and thus constitutionally permissible. Here, although the prosecutor did not pointedly question juror nine, *840 the dismissal was based on the facts revealed in the extensive juror questionnaire. The trial court's denial of the Batson challenge was not clearly erroneous.[11]

CONCLUSION
¶ 41 Under our current precedent, informing the jury that the case is noncapital and failing to object to the trial court and prosecution doing the same is deficient performance of counsel. If the death penalty is mentioned, a trial judge should state generally that the jury is not to consider sentencing. The error here, however, was nonprejudicial. Additionally, the trial court's denial of the Batson challenge to one juror was not clearly erroneous. We affirm all convictions.
C. JOHNSON, FAIRHURST, OWENS, JJ., and BRIDGE, J.P.T., concur.
CHAMBERS, J. (concurring).
¶ 42 I agree with the majority that it was improper to inform potential jurors that Phillip Hicks and Rashad Babbs did not face the death penalty. However, I do not agree that defense counsel's performance was deficient or fell below professional standards merely because he failed to object when the prosecutor and trial judge did so. See majority at 836.
¶ 43 We held in State v. Townsend, 142 Wash.2d 838, 846-47, 15 P.3d 145 (2001), that jurors should not be informed during voir dire that a case involved the death penalty. Given our clear statement of the law, it was error for the trial judge to permit the issue of punishment to be addressed in jury selection, and it was, at least technically, an error for trial counsel not to object. Id. at 847, 15 P.3d 145. But cf. State v. Mason, 160 Wash.2d 910, 931, 162 P.3d 396 (2007) (Townsend error can be harmless).
¶ 44 I write separately solely on the issue of whether this technical error on defense counsel's part amounts to deficient performance thus meeting the first element of ineffective assistance of counsel. See State v. Davis, 119 Wash.2d 657, 664-65, 835 P.2d 1039 (1992) ("[f]irst, the defendant must show that counsel's performance was deficient . . . requir[ing] showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment" (alterations in original) (quoting Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984))). It is an old adage among trial lawyers that when the law is on your side you argue the law, when it is not you argue the facts, and when you have neither you pound the table. While lawyers may not mislead the court, it is not always in the client's best interest to energetically argue every technicality of the law. The real skill in advocacy is not in high flying oratory or in raising every possible objection, but in making the hard decisions as to if, when, and how to argue the facts and the law.
¶ 45 While we have instructed in Townsend that it is improper to raise the issue of punishment during jury selection, the truth is that for the trial lawyer, jury selection is a mix of science, art, and gut feeling. What is a trial lawyer to do when she has three potential jurors whom she would love to sit on her client's case? The jurors share similar backgrounds, occupations, and experiences with her client, which causes her to believe they will relate to her client. They have made statements during jury selection which lead her to believe they will be sympathetic to the arguments she intends to advance on behalf of her client. But all three have made statements to suggest they are morally opposed to the death penalty. Trial counsel could be reasonably concerned that, if in doubt as to whether or not the case involves capital punishment, the jurors will simply declare that they cannot be fair and impartial. Trial counsel knows the law and knows her duty but could well make a calculated decision that her client has a significantly better chance of acquittal if these jurors are informed that the case is not capital and that they may, in good moral conscience, become a juror. While counsel may not mislead the court as to the law, in such a case *841 counsel should not be faulted for not objecting to the jury being informed that the case does not involve the death penalty.
¶ 46 While I can follow precedent and enforce the law, I cannot impugn the competence, integrity, or effectiveness of trial counsel in such circumstances. There was no deficient performance of counsel in this case, and thus no need to reach whether any failure should undermine our confidence in the jury's verdict. I concur in result.
SANDERS, J. (dissenting).
¶ 47 We are here challenged in two different settings to ensure the impartiality of a criminal jury. In the first trial, the jury was told by the lawyers and judge the death penalty was not sought, heightening the risk of conviction by a jury which might have been more cautious were the death penalty a prospect. In the second trial, the State removed the only African-American from the jury, creating a jury which entirely excluded anyone of the same race as the defendants.
I. Hicks and Babbs were prejudiced by ineffective counsel
¶ 48 The majority correctly holds Phillip Hicks's and Rashad Babbs's counsel "was deficient insofar as counsel informed the jury that the case was noncapital and failed to object when the trial court and prosecution made such reference";[1] however, it finesses the error by asserting it was not prejudicial. Notwithstanding, the record demonstrates the defendants were indeed prejudiced by their attorneys' error, the proper remedy being reversal and remand for new trial.
¶ 49 The majority asserts the defendants did not establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." State v. Cienfuegos, 144 Wash.2d 222, 229, 25 P.3d 1011 (2001); see majority at 836. However, that is not the test. Rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Cienfuegos, 144 Wash.2d at 229, 25 P.3d 1011 (citing Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).
¶ 50 One cannot be confident the outcome of the trial would have been the same had the jury not been told the death penalty was not an option. As we held in Townsend, advising the jury the death penalty is off the table "increase[s] the likelihood of a juror convicting the petitioner." State v. Townsend, 142 Wash.2d 838, 847, 15 P.3d 145 (2001). The majority recognizes this danger, as well as the danger jurors may be less attentive, less deliberative, and less inclined to hold out during deliberations,[2] but does not provide a remedy.
¶ 51 Rather the majority speculates defendants were not prejudiced by counsel's mistake because the jury was active in its deliberation, there was an abundance of evidence to support the conviction, and the defendants were not convicted of the most serious charges. Majority at 836-37. But none of this demonstrates the jury was not less attentive or less inclined to hold out during deliberations than they would have been if they were not informed of the noncapital nature of the case. Assuming arguendo the jury was active in its deliberation, it does not prove the deliberation might not have been more active absent counsel's error. That the defendants were convicted only of a less serious charge likewise does not demonstrate the jury might not have acquitted the defendants of all charges but for counsel's error.
¶ 52 In addition, the majority impermissibly invades the province of the jury when it rests on the alleged abundance of evidence against the defendants.[3] The majority asserts, "[a] guilty verdict was likely even if the jury had not been informed that the case was noncapital";[4] yet elsewhere we have recognized, "it is impossible for courts to contemplate *842 the probabilities any evidence may have upon the minds of the jurors." State v. Robinson, 24 Wash.2d 909, 917, 167 P.2d 986 (1946). Thus judicial confidence in the verdict is undermined.
II. The State improperly removed the only African-American juror from the jury
¶ 53 In addition to refusing to supply a remedy for the defendants' ineffective assistance of counsel, the majority errs when it upholds the trial court's denial of the defendants' Batson[5] challenge. The reasons argued by the prosecution for exercising its peremptory challenge must be examined carefully to determine if they are real or pretextual.
¶ 54 Batson holds equal protection is denied when the State excludes members of the defendant's race from the venire on the basis of their race. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). There the Court developed a three-part test to determine whether the exclusion of a juror is impermissible. First, the defendant must make a prima facie case of purposeful discrimination by the State. Id. at 93-94, 106 S.Ct. 1712. Once that showing is made, the burden shifts to the State to provide valid, nondiscriminatory reasons for challenging the juror. Id. at 97, 106 S.Ct. 1712. The majority properly holds the first two parts of the Batson test were satisfied.
¶ 55 The final step Batson requires is the trial court weigh the evidence of discrimination against the reasons presented for dismissing the juror to "determine whether the defendant has carried his burden of proving purposeful discrimination." Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). "`An invidious discriminatory purpose may often be inferred from the totality of the relevant facts. . . .'" Id. (quoting Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). "A prosecutor's motives may be revealed as pretextual where a given explanation is equally applicable to a juror of a different race who was not stricken by the exercise of a peremptory challenge." McClain v. Prunty, 217 F.3d 1209, 1220 (9th Cir.2000). See also Snyder v. Louisiana, 552 U.S. ___, 128 S.Ct. 1203, 1211, 170 L.Ed.2d 175 (2008) ("The implausibility of this explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as Mr. Brooks'."). Where a proffered reason is shown to be pretextual, it "gives rise to an inference of discriminatory intent." Id. at 1212.
¶ 56 Here the prosecution provided two separate rationales for exercising a peremptory challenge to remove juror nine. First, the State asserted the juror was an educator and a social worker, which the State believed made her a "nonstate type juror."[6] However, juror two worked for a public assistance agency and in child care licensing. The State did not peremptorily challenge that juror, even though as a social worker, she was equally a "nonstate type juror" as juror nine. Since the explanation was equally applicable to both jurors, and only the African-American juror was excluded, this reason is pretextual. If a pretext, the court may not consider the claimed racially neutral reason as a legitimate reason to exclude her. See McClain, 217 F.3d at 1222.
¶ 57 The State's second proffered reason is juror nine's relationship with someone who had served time, which apparently made her a "nonstate type juror" as well.[7] In addition to juror nine, jurors 14, 22, 55, and 37 all had relationships with others who had been incarcerated. However, unlike juror nine, the State did not challenge those jurors. The reason given by the State applied equally to all five jurors, but only the African-American juror was excused. This "gives rise to an inference of discriminatory intent" in exercising *843 a peremptory challenge to remove juror nine. Snyder, 128 S.Ct. at 1205.
III. Conclusion
¶ 58 I would reverse the defendants' convictions in the first trial because the defendants' counsel was ineffective, and confidence in the verdict but for the ineffectiveness is undermined. In the second trial, the State failed to present any nonpretextual reason for dismissing juror nine and hence violated Batson. As such, I would reverse all convictions and remand for a new trial.
¶ 59 I dissent.
ALEXANDER, C.J., and MADSEN, J., concur.
NOTES
[1] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[2] First names of the victims are used for the sake of clarity.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] The prosecution and defense actually did ask juror nine some questions, although the questioning was not extensive.
[5] Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[6] In Mason, we did note that "[i]f this court was incorrect in Townsend then, upon a proper record, our decision should be challenged in a truly adversarial proceeding. If our reasoning was flawed in Townsend, and there are legitimate strategic and tactical reasons why informing a jury about issues of punishment would advance the interest of justice and provide a more fair trial, then counsel should zealously advance the arguments." Mason, 160 Wash.2d at 930, 162 P.3d 396.
[7] In declaring a mistrial on the attempted murder charges, the trial court said:

[The jurors] have deliberated pretty steadily through two days. They worked pretty much through lunch both times. They did break for lunch, but a shortened lunch, and the presiding juror was pretty clear and pretty adamant, I thought both by what he said and the way he said it, that they were not going to benefit from further deliberation, and we have to remember that they had sent out a question earlier that seemed to indicate that they were already at impasse, and they've had a good bit of time since then to try to break that impasse with no apparent movement whatsoever.
VRP (May 14, 2003) at 21.
[8] Evans did not involve the sole member of the minority class on the venire. Evans, 100 Wash. App. at 761, 998 P.2d 373 (the venire included five persons of color).
[9] Both Rhodes and Wright, however, involved the sole remaining African-American on the venire. Rhodes, 82 Wash.App. at 201, 917 P.2d 149; Wright, 78 Wash.App. at 97, 896 P.2d 713.
[10] See, e.g., United States v. Chalan, 812 F.2d 1302, 1314 (10th Cir.1987) (finding that "the additional fact that the Government used its peremptory challenges to strike the last remaining juror of defendant's race is sufficient to `raise an inference' that the juror was excluded `on account of [his] race.'" (alteration in original) (quoting Batson, 476 U.S. at 96, 106 S.Ct. 1712)).
[11] After oral arguments but before our decision in this case, the United States Supreme Court issued its decision in Snyder v. Louisiana, ___ U.S. ___, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008). This opinion changes neither the analysis nor the outcome of this case.
[1] Majority at 836.
[2] Majority at 836 (citing Townsend, 142 Wash.2d at 847, 15 P.3d 145).
[3] Although the majority claims there was overwhelming evidence against the defendants, the record presents a somewhat mixed story. Jonathan Webber was unable to identify Babbs as a shooter, and no one placed Babbs at the scene of the crime.
[4] Majority at 837.
[5] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[6] I find it difficult to accept the logic that one who works for the government is less likely to favor it, a novel theory.
[7] Amicus American Civil Liberties Union argues this reason, even if not pretextual, is not race-neutral based on the disparity of incarceration and arrest rates by race. My analysis does not require significant exploration of this argument.