2015 JAN 20 AM 9: 42


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
)   DIVISION ONE
    Respondent, )
)   No. 70506-7-I
    v. )
)   UNPUBLISHED OPINION
FRANCISCO MENDOZA-GOMEZ, )
)
    Appellant. )   FILED: January 20, 2015
_____ )

DWYER, J. — Following a jury trial, Francisco Mendoza-Gomez (Mendoza) was convicted of conspiracy to commit murder in the first degree, kidnapping in the first degree, and assault in the second degree. On appeal, Mendoza contends that, because his trial attorney failed to interpose an objection or request a mistrial after his co-defendant's counsel informed the venire during jury selection that the trial did not involve the death penalty, he was deprived of his right to the effective assistance of counsel. Because Mendoza does not establish that his counsel's performance was deficient and because Mendoza has not shown that he suffered any prejudice as a result of the alleged deficiency, we affirm.

I

On the afternoon of September 30, 2011, Tawney Eckert and her husband, Taylor, arrived at a Shell gas station in Federal Way. As they entered the station parking lot, the Eckerts noticed a black Acura SUV parked nearby. The SUV pulled up to the front of the station's convenience store as Taylor

noticed a commotion inside the store. Suddenly, two men bolted from the store and jumped into the SUV, which sped away. Taylor noticed that one of the men, who appeared to be of Samoan descent (the Samoan man), was holding a gun. Another bystander heard the driver of the SUV, a woman, yell to the two men that they needed to go as they exited the store.

The Eckerts entered the store, and found Juan Moreno-Zuazo (Moreno) lying on the floor behind the cash register. Moreno had gashes on his forehead and jaw and was bleeding significantly. Tawney, a trained paramedic, began to treat Moreno's injuries while her husband spoke with a 911 emergency dispatcher.

Federal Way Police Department officers responded to the Shell station and spoke to the clerk, Hossam Gayed, who was working there that afternoon. Gayed testified that he had been behind the cash register when a man crashed through the front door of the store and leapt over the counter. The man was followed in hot pursuit by a larger, Samoan man. Fearing that the store was about to be robbed, Gayed hid in an interior office, behind a locked door. From inside the office, he heard a man screaming and yelling. When he came out of the office, he saw the man who had raced into the store first lying on the ground. He was bleeding severely from the head and neck and was being treated by Tawney.

Moreno described the events leading up to his dramatic entrance into the gas station store at trial. He testified that he paid a visit to a SeaTac apartment in the mid-afternoon of September 30 to see a woman named Cheila. Moreno

- 2 -

had met Cheila at the apartment a few days prior while visiting Mendoza but did not know that she was Mendoza's sister-in-law. Moreno and Cheila were speaking when, without notice, Mendoza arrived at the apartment, accompanied by Amalia Cervantes-Castillo (Castillo).

Mendoza, who appeared to be angry, demanded to speak with Cheila privately. Castillo remained with Moreno and told him that he was in trouble. About 10 minutes later, two men, including the Samoan man, arrived at the apartment and spoke to Castillo. The Samoan man then walked up to Moreno, pointed a handgun at his torso, and pushed him toward a waiting vehicle. Moreno was driven at gunpoint to a Tukwila motel, where he was escorted into a room.

The Samoan man, Agalega Pua, testified that he had been sleeping in a room at a Tukwila motel on the afternoon of September 30 when he was awoken by a phone call from Castillo, his older brother's long-term romantic partner. Castillo told Pua that a car would be coming to pick him up at his motel. When the car arrived, Pua was driven to Castillo's location, at the SeaTac apartment. Castillo told Pua that Moreno had been caught in a compromising situation with the wife of Mendoza's brother. She gave Pua a handgun and told him to keep watch on Moreno. Castillo talked to Mendoza then returned and told Pua that Mendoza had directed her to kill Moreno.

At Castillo's direction, Pua took Moreno at gunpoint to a waiting car, which transported them back to Pua's Tukwila motel room. A few minutes later, Mendoza and Castillo arrived, along with Mendoza's brother, and spoke angrily

- 3 -

with Moreno. Mendoza was armed with a .45 caliber handgun and a baseball bat. Mendoza swung the bat at Moreno's head. Moreno's hand was injured after he raised it to block the impact to his skull.

Mendoza spoke to Castillo and then gave his .45 caliber pistol to Pua. Castillo told Pua to take Moreno to a waiting black Acura SUV with her. Once inside the vehicle, Castillo told Pua that they were going to kill Moreno. She also informed Moreno, in Spanish, that she had been ordered to kill him. Castillo then drove the SUV to pick up a friend, Eric Tharp, in Federal Way. When Tharp got into the car, he suggested that Fort Lewis, in Tacoma, would be a suitable place to dispose of Moreno. The SUV began to experience mechanical trouble, and Tharp suggested that they stop at a nearby Walmart for "oil."[1] Upon returning to the SUV, Tharp realized that he did not have a funnel to pour the fluid into the vehicle's receptacle and directed Castillo to drive to the Shell station across the street. At the gas station, Tharp obtained a funnel and poured the "oil" into the SUV. Castillo, who had kept the vehicle's doors locked throughout this time, unlocked the doors so that Tharp could enter. Castillo neglected to re-lock the doors before beginning to drive away. Moreno seized the opportunity to escape, running from the car into the gas station store. Pua and Tharp both chased after Moreno. Once they caught him, they beat and kicked him. They then returned to the car, which drove away.

---

[1] In actuality, the vehicle required transmission fluid, which Tharp purchased.

Pua testified that he received a few hundred dollars and a small amount of methamphetamine from Mendoza for his efforts. Pua explained that Mendoza was upset with him because Moreno had survived.

Castillo and Tharp were stopped while driving together on October 12, 2011 and arrested. A search of the vehicle recovered a number of firearms and a notebook entitled "Maty's little book." "Maty" is Castillo's nickname. On one page, dated September 30, 2011, the following entry was made: "Today I start a new beginning with Chaparro." "Chaparro" is Mendoza's nickname.

Mendoza did not testify in his defense. Castillo testified in her case in chief. She claimed that Mendoza had phoned her on the afternoon of September 30 because he had discovered Moreno with his sister-in-law and Moreno had threatened to beat him up. She told the jury that she removed Mendoza from the scene to avoid any conflict and that they were surprised when they visited Pua later that afternoon at his motel room and found Moreno there. Castillo testified that Moreno and Mendoza began to argue and that Mendoza struck Moreno with a bat. Castillo claimed that she interceded and offered to give Moreno a ride to Tacoma to prevent further fighting.

Castillo claimed not to understand why Moreno bolted from the SUV at the gas station or why Pua chased after him. She testified that she directed Tharp to bring Pua back to the car and that she drove away, leaving Moreno behind, once they returned. Castillo denied that Mendoza had directed her to kill Moreno. She did admit, however, that she worked for Mendoza, for example, managing his fleet of vehicles, which included the black Acura SUV.

Mendoza, Castillo, Pua, and Tharp were charged with several offenses arising out of this series of events. Initially, Mendoza and Tharp were tried together, following severance of Pua's and Castillo's cases. Mendoza's and Tharp's trial ended in a mistrial due to prosecutorial error, and their cases were scheduled for a new trial. Before the retrial, Tharp pleaded guilty to amended charges. Mendoza's case was then joined with Castillo's, and the two were prosecuted together on charges of conspiracy to commit murder in the first degree.[2] Mendoza was also tried for kidnapping in the first degree and assault in the second degree.[3] By jury verdicts rendered on April 26, 2013, Mendoza was convicted on all counts. Castillo was also found guilty on the conspiracy charge.

II

Mendoza contends that he was denied the effective assistance of counsel. This is so, he asserts, because his trial attorney failed to interpose an objection or take any other action after his co-defendant's counsel informed the venire during voir dire that the trial did not involve the death penalty. We disagree.

We apply the two-part test from Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to determine whether a defendant had constitutionally sufficient representation. State v. Cienfuegos, 144 Wn.2d 222, 226-27, 25 P.3d 1011 (2001). First, the "'defendant must show that counsel's

---

[2] By this time, Castillo had already been convicted at a separate trial on charges of kidnapping, unlawful possession of a firearm, and possession of methamphetamine. The jury at her first trial was unable to reach a unanimous verdict as to the charge of conspiracy to commit first degree murder. Hence, the retrial with Mendoza occurred.

[3] The conspiracy and kidnapping charges included a firearm sentencing enhancement; the assault included a deadly weapon sentencing enhancement.

performance was deficient.'" Cienfuegos, 144 Wn.2d at 226 (quoting Strickland, 466 U.S. at 687). To establish deficient performance, a defendant must "demonstrate that the representation fell below an objective standard of reasonableness under professional norms." State v. Townsend, 142 Wn.2d 838, 843-44, 15 P.3d 145 (2001). Second, the "'defendant must show that the deficient performance prejudiced the defense.'" Cienfuegos, 144 Wn.2d at 227 (quoting Strickland, 466 U.S. at 687). "Proving that counsel's deficient performance prejudiced the defense 'requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" State v. Hicks, 163 Wn.2d 477, 488, 181 P.3d 831 (2008) (quoting Strickland, 466 U.S at 687). Reversal of the outcome of a trial court proceeding is required only where the defendant demonstrates both deficient performance and resulting prejudice. Strickland, 466 U.S. at 687.

"[I]t is error to inform the jury during the voir dire in a noncapital case that the death penalty is not involved." Hicks, 163 Wn.2d at 487; accord Townsend, 142 Wn.2d at 840; see also Shannon v. United States, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994) ("It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" (footnote omitted) (quoting Rogers v. United States, 422 U.S. 35, 40, 95 S. Ct. 2091, 45 L. Ed. 2d 1 (1975))); State v. Bowman, 57 Wn.2d 266, 271, 356 P.2d 999 (1960) ("The question of the sentence to be imposed by the court is never a proper issue for the jury's deliberation, except in capital cases."). There is no "distinction between a court

or counsel-initiated and a juror-initiated discussion of the inapplicability of the death penalty." Hicks, 163 Wn.2d at 487; accord State v. Mason, 160 Wn.2d 910, 929, 162 P.3d 396 (2007). "[I]n response to any mention of capital punishment, the trial judge should state generally that the jury is not to consider sentencing." Hicks, 163 Wn.2d at 487.

Moreover, "[c]onsidering the long-standing rule that no mention be made of sentencing in noncapital cases," defense counsel's performance will be deemed deficient for informing the jury that a case does not involve the death penalty or failing to object when another actor makes similar reference, *unless* "counsel's performance is the result of legitimate trial strategies or tactics." Townsend, 142 Wn.2d at 847; see also Mason, 160 Wn.2d at 930 (acknowledging the possibility that "there are legitimate strategic and tactical reasons why informing a jury about issues of punishment would advance the interest of justice and provide a more fair trial"); State v. Rafay, 168 Wn. App. 734, 781, 285 P.3d 83 (2012) (holding that it was a legitimate strategy to inform the venire during voir dire that the case did not involve the death penalty). We are mindful of the risk, identified by our Supreme Court, that "if jurors know that the death penalty is not involved, they may be less attentive during trial, less deliberative in their assessment of the evidence, and less inclined to hold out if they know that execution is not a possibility." Townsend, 142 Wn.2d at 847. Yet, "[w]e must presume that defense counsel [was] well aware of [this concern]," and that she "[was] in the best position to assess such concerns in light of [her] own voir dire and trial strategies." Rafay, 168 Wn. App. at 781.

- 8 -

Mendoza's claim of ineffective assistance pertains to the following discussion between co-defendant Castillo's counsel and a venire member during that attorney's first round of questioning during the voir dire stage of jury selection, with the entire venire present in the courtroom:

> MS. CRUZ: I'd like to hear from you. Was it religious views or philosophical views that make you feel that you would not be able to sit on this particular jury with these charges?
> JURY PANELIST 9: It was unclear to me as to whether this was-
> MS. CRUZ: Can I have you speak into the mic.
> JURY PANELIST 9: It was unclear to me whether there was a death penalty involved.
> INTERPRETER: I didn't hear, something involved.
> JURY PANELIST 9: Death penalty. If that were the case, I would be uncomfortable.
> MS. CRUZ: In this particular case, we are not dealing with a death penalty case. Does that change it?
> JURY PANELIST 9: I have no problem.
> MS. CRUZ: You have no problem sitting on the jury then?
> JURY PANELIST 9: That's correct.

Mendoza's counsel did not interpose an objection during or after this exchange, nor did she later request a mistrial or an instruction from the court directing the venire to disregard any sentencing consequences when considering the evidence presented at trial.

Beginning with the first part of the Strickland test, Mendoza must prove that his counsel's performance was deficient. There is a strong presumption that trial counsel's performance was adequate, and exceptional judicial deference must be given when evaluating counsel's strategic decisions. Strickland, 466 U.S. at 689; State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). If trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim that the defendant received ineffective

assistance of counsel. State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). We have previously recognized that "there might be legitimate tactical reasons in a noncapital case to inform the jury that the case does not involve the death penalty." Rafay, 168 Wn. App. at 777. The presumption of adequate representation is not overcome if there is any "conceivable legitimate tactic" that can explain counsel's performance. State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

In this case, at least two legitimate tactical reasons exist for declining to object to the venire being informed that the case did not involve the death penalty. First, it is conceivable that Mendoza's attorney may have been favorably impressed by this panel of prospective jurors. The conversation between Jury Panelist 9 and Mendoza's co-defendant's attorney took place toward the end of that attorney's first round of voir dire, after the trial court had posed general questions and after the State's first round of questioning. Thus, Mendoza's counsel had a basis upon which to assess the venire. It is easily conceivable that counsel may have made the tactical determination that the risk of requesting a mistrial, which would have caused the existing venire to be replaced, possibly by a panel she found more problematic, outweighed the risk of moving forward with the existing panel. Second, it is conceivable that Mendoza's counsel made the strategic decision to remain silent rather than interposing an objection with the expectation that, because she did not invite the error, the exchange between Jury Panelist 9 and the co-defendant's attorney could form

the basis of a later appeal if Mendoza was convicted at trial.[4] This is, of course, exactly what happened. Mendoza has not established deficient representation.

Under the second part of the Strickland test, Mendoza must also prove that he was prejudiced by his counsel's allegedly deficient performance. This requires the defendant to prove that, but for counsel's deficient performance, there is a "reasonable probability" that the outcome would have been different. Cienfuegos, 144 Wn.2d at 227; see also State v. Crawford, 159 Wn.2d 86, 99-100,147 P.3d 1288 (2006) (defining a "reasonable probability" as a probability sufficient to undermine confidence in the outcome).

There is no showing that Mendoza was deprived of a fair trial or that the trial outcome likely would have differed. There is no indication that the jurors failed to take their duty seriously. Moreover, there is abundant evidence in the record to support Mendoza's conviction, making a guilty verdict likely even if the jury had not been informed that the case was noncapital. Here, the victim of a terrifying series of events testified to his abduction and planned execution by gunshot at Mendoza's direction. The victim's testimony was corroborated by one of Mendoza's henchmen and significant physical and video evidence. Under these circumstances, there is not a reasonable probability that the jury would have implicitly accepted Mendoza's explanation and acquitted him of the charge of conspiracy to commit murder if only they had not been relieved of a

---

[4] In its merits briefing, the State also suggests that, given the stigma of being charged with a capital offense, Mendoza's counsel could have felt that it would reflect more favorably upon her client for the jury to learn that the State did not believe his actions warranted the harshest punishment.

hypothetical, mistaken belief that he might be subjected to capital punishment. Mendoza establishes neither deficient performance nor prejudice.

Affirmed.

We concur: