# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

STATE OF WASHINGTON, )
                             )
          Respondent, )
                             )
v. )
                             )
KARL EMERSON PIERCE, )
                             )
          Appellant. )

No. 74363-5-I

ORDER WITHDRAWING OPINION
AND SUBSTITUTING OPINION

The court has determined that the opinion filed on June 11, 2018, should

be withdrawn and a substitute opinion be filed. Now, therefore, it is hereby

ORDERED that the opinion filed on June 11, 2018, be withdrawn and a

substitute opinion be filed.

FOR THE COURT:

_Trickey, J_

_Schindler, J_

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2018 AUG 27 AM 11:38


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,                )
                                    )       No. 74363-5-I
            Respondent,             )
                                    )       DIVISION ONE
    v.                              )
                                    )       UNPUBLISHED OPINION
KARL EMERSON PIERCE, †              )
                                    )
            Appellant.              )       FILED: August 27, 2018

TRICKEY, J. — Karl Pierce and Michael Bienhoff claimed that they were involved in a marijuana deal with Precious Reed and Demetrious Bibb. During the transaction, an altercation occurred between Bienhoff and Reed. A handgun discharged and killed Reed.

The State ultimately charged codefendants Pierce and Bienhoff with first degree felony murder predicated on robbery in the first degree, with a deadly weapon allegation. The State's theory at trial was that Pierce and Bienhoff intended to rob Reed, rather than to sell him marijuana. The jury convicted Pierce as charged. He appeals. Because the prosecutor committed misconduct during voir dire that prejudiced Pierce, we reverse Pierce's conviction and remand for a new trial.

---

† Karl Pierce and Michael Bienhoff were tried as codefendants in the trial court. In this court, the appeals were linked for hearing but not consolidated. For clarity, we have written two opinions and revised each case caption to refer only to the appellant in each appeal.

## FACTS

Reed and Bienhoff had known each other for several years. In February 2012, Reed asked Bienhoff to sell him a couple of pounds of marijuana. On February 20, 2012, Bienhoff told Reed that he would sell Reed two pounds of marijuana for $2,200 per pound. Reed replied that he still wanted the marijuana but needed to raise money. Bienhoff claimed that he picked up two and a half pounds of marijuana from his supplier for $1,800 per pound.

Bienhoff planned to meet Reed near Green Lake, an area of North Seattle, to conduct the transaction. Bienhoff went to Ramon Lyons's home in the Bitter Lake community. Lyons helped Bienhoff arrange for Scott Barnes to provide a ride.

When Barnes arrived at Lyons's home, Lyons was on the front porch cleaning a revolver. After meeting with Barnes, Bienhoff asked Lyons to accompany them as "insurance."[1] Lyons agreed, and the group went to pick up Lyons's friend, Pierce. Bienhoff and Pierce had not previously met. Bienhoff claimed to have separated the two pounds of marijuana he planned to sell to Reed and the extra half pound into two backpacks.[2]

Barnes drove the group back to Lyons's house. Lyons testified that Bienhoff said that he did not feel safe and asked to borrow a gun. Lyons and Pierce got out of the car, and Lyons entered the house. Lyons retrieved two handguns. One was a gray or chrome colored .45 caliber semiautomatic pistol. The other was the

---

[1] Report of Proceedings (RP) (Oct. 27, 2015) at 3435.
[2] Barnes testified that the group went directly from Pierce's home to Green Lake without making any stops.

2

revolver Lyons had been cleaning earlier. After Lyons and Pierce returned to the car, Barnes drove the group toward Green Lake.

While en route, Lyons gave the revolver to Bienhoff.[3] When the group stopped at a gas station, Bienhoff and Barnes left the car. While alone in the car, Lyons warned Pierce to watch Bienhoff, and gave him the semiautomatic pistol.[4]

After leaving the gas station, Barnes drove to Green Lake. He parked the car near the lake in an upper parking lot of Woodland Park. Bienhoff got out of the car. He hid the backpack in a bush. After asking Barnes to move the car away from the lot, Bienhoff asked Lyons to stay out of sight but within earshot of where Bienhoff was going to meet Reed. Lyons told Pierce to "back up" Bienhoff to ensure that he was not robbed.[5]

Reed arrived driving a gray van. A white Cadillac followed Reed's van into the parking lot. Reed parked, and the white Cadillac stopped further down the lot. Pierce was outside of Barnes's car. He found a vantage point from which he could see Reed's van and the white Cadillac. Pierce observed that Reed and the driver of the Cadillac were both black males.

Reed and the driver of the Cadillac, later identified as Bibb, exited their vehicles and greeted Bienhoff. Bibb had agreed to pay half the cost of the marijuana, and thought the deal was $2,000 for two pounds. Bibb planned to

---

[3] At trial, Bienhoff denied asking Lyons for a weapon and that he knew that Lyons and Pierce were armed. Pierce testified that he did not see any other members of the group carrying guns, and that he did not think Bienhoff was armed. But Barnes testified that he observed Lyons handing the revolver to Bienhoff and that he noticed that Pierce was armed.

[4] Lyons testified that he gave the .45 caliber handgun to Pierce while the entire group was in the car and driving toward Green Lake from the gas station.

[5] RP (Oct 22, 2015) at 3250.

3

"front" the marijuana, or pay part of the purchase price at the transaction, sell some of the purchased marijuana, and then pay the seller the outstanding balance.[6] Bibb denied having a gun that day, and did not think that Reed was armed.

Bienhoff recovered the backpack and Bibb returned to the Cadillac. Reed got into his van and sat in the driver's seat. Bienhoff also entered the van and sat in the front passenger's seat. Bienhoff claimed that he showed Reed the marijuana. Reed told Bienhoff that he did not have the full amount of money to buy the marijuana. Reed asked Bienhoff to front the marijuana, but Bienhoff declined.

Bienhoff testified that he began to exit Reed's van. He claimed that he saw Reed reaching to his left for the butt of a handgun. He claimed that he and Reed wrestled for the handgun. The handgun, a revolver with a 10-inch barrel, discharged into Reed's shoulder. The bullet travelled upwards into Reed's brain and caused his death.

The shot temporarily deafened Bienhoff. He grabbed the backpack, exited Reed's van, and ran to Barnes's car. While running, Bienhoff saw Bibb standing between Reed's van and the Cadillac. He did not notice whether Bibb was armed or had fired any shots.

Pierce had seen Reed's van start to rock and assumed there was a struggle. Pierce moved closer to the van. Bienhoff ran past Pierce, who heard Bienhoff say that Reed had attempted to rob him. Pierce saw a black male come around the front of Reed's van, and heard a boom. Pierce thought the man was shooting at

---

[6] RP (Oct. 1, 2015) at 1678.

him. He ran toward Barnes's car without drawing his gun.

Lyons had initially moved toward the lake but had begun to head back to the upper parking lot. On his way, he heard gunfire and "hit the ground."[7] Once he got up, he saw Pierce running toward the parking lot without a gun in his hand. Lyons heard multiple gunshots. He ran back toward Barnes's car, and heard tires squeal after the gunfire ended.

Barnes remained in his car. Barnes heard five gunshots in rapid succession and thought he could hear them striking metal.

Bibb testified that he remained in the Cadillac. He observed Reed's van while Reed and Bienhoff were inside. Bibb did not hear raised voices, see a struggle, or hear a gunshot.

Bibb saw another individual, who he later described as 5 feet 8 inches tall or 5 feet 9 inches tall, run between the Cadillac and the van, turn towards Bibb, and began firing at him with a dark-colored gun. Bibb ducked down, put his car in gear, and rapidly left the parking lot. Bibb heard and felt bullets strike the Cadillac. He later found bullet holes in its side.

There were two eyewitnesses who observed the incident. The first, Earl Cadaret, watched through the kitchen window of his recreational vehicle, which was parked in the same lot as Reed's van and Bibb's Cadillac. Cadaret observed two black males, one of whom was substantially taller than the other, walking toward the van and the Cadillac.

---

[7] RP (Oct. 15, 2015) at 2566.

5

Cadaret saw the taller man enter the driver's side of the Cadillac. He later noticed the same man standing outside of the Cadillac looking at the van, and then saw him in front of the van with his arm extended. Cadaret heard several loud noises that may have been "bangs, pops, or rattle[s]."[8]

Cadaret saw the Cadillac drive away, and did not see anyone shooting at it. He watched the shorter man fall out of the van. After the Cadillac was gone, Cadaret went to the man on the ground and called 911. When the police interviewed him later, Cadaret stated that the man in the Cadillac looked like he had a gun and had shot the man in the other car.

The second eyewitness was Mark Howard. He was sitting in his truck, which was in the parking lot where the incident occurred. He saw a minivan and light-colored sedan park in the lot. He viewed two black males and one white male standing in the lot before the white man retrieved a backpack from some bushes.

Howard watched the two black males head toward the minivan and the sedan. Shortly thereafter, Howard heard "popping" sounds.[9] He saw a man he later identified as Pierce running and holding a silver-colored automatic gun.

Howard thought Pierce was shooting at the minivan and the sedan, although he did not see any muzzle flashes or discharged shell casings. Howard testified that he might have seen another armed man behind the shooter. Howard fled the parking lot in his truck. He returned later to give police a recorded statement after he saw a report of the incident on the news.

---

[8] RP (Sept. 30, 2015) at 1433.
[9] RP (Sept. 30, 2015) at 1531.

6

Once Bienhoff, Pierce, Lyons, and Barnes were in Barnes's car, Pierce said that he thought the driver of the Cadillac had shot at them. Barnes testified that Pierce told the group that he saw Reed "slumped" in the van.[10] Barnes also testified that Pierce said that he had been "busting at the caddy" and that he would dispose of the weapons.[11] Barnes testified that Lyons said, "'Nobody say anything, or we're all screwed.'"[12]

Pierce testified that he put the gun Lyons had given him on the floor of Barnes's car. Lyons did not see any guns in Barnes's car after the incident. Bienhoff later claimed that he gave the marijuana to someone he knew.

Police officers found Reed face down on the ground next to his van. The van's doors were open. Reed had approximately $1,200 in cash on his person, and no gun was found at the scene. Several .45 caliber shell casings were found in the parking lot. A crime laboratory concluded that a .38 caliber gun and a .45 caliber gun had been discharged during the incident.

While watching the news that night, Pierce heard that someone had been shot at Green Lake, and went into hiding for about a month. Bibb learned that Reed had died later that evening or early the next morning. When police interviewed Bibb the next day, he gave them permission to confiscate the Cadillac. When Bibb was shown photomontages, he identified Bienhoff and tentatively identified Pierce as the person who had shot at him.[13]

---

[10] RP (Oct. 12, 2015) at 2138.
[11] RP (Oct. 12, 2015) at 2138. Pierce denied that he had disposed of or destroyed the gun or any cell phones linked to the incident.
[12] RP (Oct. 12, 2015) at 2138.
[13] Bibb identified Pierce's photograph as the one who "most closely resembled" the person that shot at him.

The State charged Bienhoff and Pierce by amended information with murder in the first degree by reason of causing Reed's death while committing or attempting to commit the crime of robbery in the first degree. The charge included a deadly weapon allegation. The State also charged Lyons and Barnes as codefendants with Bienhoff and Pierce, but they pleaded guilty to lesser charges in exchange for their testimony at trial.

At trial, the State's theory was that Bienhoff did not bring marijuana to the meeting with Reed, and intended to rob Reed of the purchase money. The State contended that Pierce was the second shooter. Bienhoff denied that the group discussed a robbery. Bienhoff testified that he only discussed guns with Pierce, Lyons, and Barnes to say that someone had shot at them.

The jury convicted Pierce as charged, and he appeals.[14]

ANALYSIS

Prosecutorial Misconduct During Voir Dire

During voir dire, the prosecutor discussed the death penalty with potential jurors. Bienhoff objected, stating,

> Your Honor, I have a very, very strenuous objection to the proceeding that we have, and I'm afraid I have to ask for a mistrial. I believe that what's [sic] - - we have seen right here is the State attempting to death-qualify a panel where the death penalty is not on the table, and that's completely inappropriate.[15]

---

[14] Additional facts will be included as appropriate in the sections of analysis.
[15] RP (Sept. 23, 2015) at 838.

8

Pierce joined in the objection and the motion.[16] The trial court ruled that the questioning was not improper.[17]

The trial court supervises voir dire, and "'a great deal must, of necessity, be left to its sound discretion.'" State v. Davis, 141 Wn.2d 798, 825, 10 P.3d 977 (2000) (internal quotation marks omitted) (quoting Ristaino v. Ross, 424 U.S. 589, 594-95, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976)). "Where prosecutorial misconduct is claimed, the defense bears the burden of establishing the impropriety of the prosecuting attorney's comments and their prejudicial effect." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). "To establish prejudice, the defense must demonstrate there is a substantial likelihood the misconduct affected the jury's verdict." Brown, 132 Wn.2d at 561. Thus, "[a]llegations of prosecutorial misconduct are reviewed under an abuse of discretion standard." State v. Brett, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995) (citing State v. Hughes, 106 Wn.2d 176, 195, 721 P.2d 902 (1986)).

To ensure that the jury remains impartial and is not unduly influenced, the jury may not be informed of the sentence to be imposed by the trial court, except

---

[16] The State argues that Pierce cannot raise this issue for the first time on appeal because he failed to object to the discussion of the death penalty below.

Generally, challenges to the process of selecting a jury may not be raised for the first time on appeal because jury selection is a procedural matter, not a constitutional issue. State v. Elmore, 139 Wn.2d 250, 277, 985 P.2d 289 (1999) (citing State v. Tharp, 42 Wn.2d 494, 501, 256 P.2d 482 (1953)); State v. Gentry, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995)). But "[a] party may raise a claim of error which was not raised by the party in the trial court if another party on the same side of the case has raised the claim of error in the trial court." RAP 2.5(a).

Here, Bienhoff objected to the prosecutor's discussion of the death penalty. Pierce joined in this objection and a motion for a mistrial based on the prosecutor's statements. We conclude that Pierce may raise this issue on appeal under RAP 2.5(a).

[17] RP (Sept. 23, 2015) at 824.

in capital cases. <u>State v. Townsend</u>, 142 Wn.2d 838, 846, 15 P.3d 145 (2001); <u>State v. Bowman</u>, 57 Wn.2d 266, 271, 356 P.2d 999 (1960). Thus, the jury may not be informed that the death penalty is not involved during voir dire in a noncapital case. <u>State v. Hicks</u>, 163 Wn.2d 477, 487, 181 P.3d 831 (2008) (citing <u>Townsend</u>, 142 Wn.2d at 840).[18]

Here, jury selection occurred over four days. The trial court informed each group of prospective jurors that the State had charged Pierce and Bienhoff with murder in the first degree.

During the first day of voir dire, the prosecutor asked the trial court outside of the presence of any potential jurors "how the Court [would] address the jury if anybody ask[ed] the question of whether or not this [was] a death penalty case."[19] The trial court's response was that, when the question had been raised in the past, it "sort of evaded the question."[20] The trial court added that, when it came up again, it addressed each juror who had a concern individually. The trial court also said it could address the potential jurors as a whole if counsel wanted it to do so.

The prosecutor responded that

> [t]he State's preference is to address it head on, of course, in accordance with the law, which is to instruct them that our state Supreme Court has decided that that is not something that they are privy to, or we cannot tell them if this is a death penalty case or not, and then ask them the follow-up question. Basically, not knowing whether this is a death penalty case or not, does that cause you

---

[18] The State argues that <u>Townsend</u> was incorrectly decided and should be overruled. This court is bound by Washington Supreme Court precedent and does not have the authority to overrule its decisions. <u>State v. Jussila</u>, 197 Wn. App. 908, 931, 392 P.3d 1108 (2017). Further, <u>Townsend</u> has been favorably cited in subsequent cases examining this issue. <u>See</u> <u>Hicks</u>, 163 Wn.2d at 487-89. We reject the State's request to overrule <u>Townsend</u>.
[19] RP (Sept. 21, 2015) at 405.
[20] RP (Sept. 21, 2015) at 406.

concern as to whether or not you could be a fair and/or impartial juror is this case.[21]

The trial court replied that

[m]y preference would be not to ask the follow-up question, but just tell them that and then go on and see if any of them raises the issue beyond that. But I don't know what you think about that.

> The problem is if I invite them to say, you know, can you be fair and impartial, then anybody who for some reason or other couldn't like the idea of being here has a good way to head for the door.[22]

The prosecutor then stated that if the trial court "leaves it as that sort of pregnant issue before the jury, I will ask that follow-up question or I intend on asking the follow-up question, because that obviously would be a concern for, I think, both parties."[23] Counsel for Bienhoff agreed. The trial court concluded the discussion by stating, "It's probably less of a concern if you ask the question than if I ask the question."[24] The prosecutor said he would defer to the trial court.

On the morning of the third day of jury selection, the trial court dismissed Juror 56 because his conscience would bother him if he voted to convict a person who after spending years in prison was found to be innocent.[25] In the afternoon that day, during the third round of attorney questioning, the prosecutor referred to Juror 56's being dismissed because of the "weight of being a juror.[26]" He informed the potential jurors that the jury was tasked with determining the guilt or innocence

---

[21] RP (Sept. 21, 2015) at 406.
[22] RP (Sept. 21, 2015) at 406.
[23] RP (Sept. 21, 2015) at 407.
[24] RP (Sept. 21, 2015) at 407.
[25] RP (Sept. 23, 2015) at 798-801.
[26] RP (Sept. 23, 2015) at 824.

of Pierce and Bienhoff, and would have no role in deciding their punishment. No prospective juror had expressed concerns about the death penalty at that point.

The prosecutor then said,

> . . . Does that make sense? Do you guys all understand that? Everyone is nodding their head.
>
> Are you okay with it? Everybody in the jury box seems to be nodding their head.
>
> Anybody have a concern about that or think that doesn't make sense? Anybody? No one?
>
> What about over here? Everyone okay with that? Does that cause you any concern about being a juror in this case where the charge is murder in the first degree? Anybody?[27]

In response to the prosecutor's repeated questions and reminder of the charge against Pierce, a juror asked whether Washington State used the death penalty. The prosecutor deferred to the trial court, who told the potential jurors that it could not tell them whether or not the death penalty was involved in the present case. The prosecutor responded to several juror questions regarding the death penalty.[28]

The trial court then excused the jury to consider the defense objection to the State's effort to "death-qualify a jury on a non-death penalty case."[29] The trial court disagreed that the State was "death-qualify[ing]" the jury.[30] The trial court

---

[27] RP (Sept. 23, 2015) at 825.
[28] For example, several jurors expressed concerns about being involved in a case where the death penalty could be imposed, and discomfort about not knowing whether the death penalty was at issue. One juror implied that they knew the process by which the death penalty is imposed in Washington. The prosecutor generally responded to the jurors' questions by stating that he and the trial court could not tell the jurors whether the death penalty was at issue, and asking each juror if they could still be impartial.
[29] RP (Sept. 23, 2015) at 839.
[30] RP (Sept. 23, 2015) at 839.

12

said the State "pivoted off" Juror 56's concerns about "sitting in judgment" and was only asking if any juror had a "problem not being involved in the penalty."[31] The defense responded that the State's extensive and "invitational" questioning prompted the discussion of the death penalty.[32] The trial court ruled that the State's questioning was not improper and expressed surprise that the topic had not come up earlier in jury selection since the charge was murder in the first degree.[33]

We conclude that the prosecutor's repeated questioning of the potential jurors prior to the discussion of the death penalty constituted prosecutorial misconduct, and that the trial court abused its discretion in failing to curtail the prosecutor's line of questioning.

The record reveals that the potential jurors indicated that they understood the prosecutor's description of the jury's role and did not have follow up questions. But the prosecutor nonetheless elicited a discussion of the death penalty through his repeated questioning of the jury's understanding and recitation of the charges against Pierce and Bienhoff. He did so despite being aware of the Washington Supreme Court's position that the jury must not be told whether the death penalty is possible in any given case. Therefore, the prosecutor's elicitation of a discussion on the death penalty constituted improper conduct sufficient to support a claim of prosecutorial misconduct.

---

[31] RP (Sept. 23, 2015) at 839.
[32] RP (Sept. 23, 2015) at 845.
[33] RP (Sept. 23, 2015) at 846.

Further, there is a substantial likelihood that the prosecutor's improper comments prejudiced Pierce and Bienhoff. During the discussion of the death penalty, Juror 6 expressed concern over taking part in a decision that led to the imposition of either the death penalty or a life sentence. Although Juror 6 initially said that she could remain impartial, she later stated that she would be unable to render a decision while "not knowing whether or not [the death penalty is] even a possibility."[34] The State moved to strike Juror 6 for cause based on her responses, which the trial court denied. But the trial court allowed the State to exercise a preemptory challenge against Juror 6 in part because of her responses during the death penalty discussion.

Juror 76 was also dismissed based on her response to the improper discussion about the death penalty. After several jurors had asked questions about the death penalty, Juror 76 said, "I think just sitting here, I didn't realize that -- I don't know if I could make that decision for people. I really get so nervous. I couldn't even eat what I brought for lunch. I can't decide."[35] The prosecutor asked Juror 76, "Are you saying having heard all of this that you wouldn't be able to fairly take in all the evidence and follow the law and make the decision that's being asked of you?"[36] In response, Juror 76 said, "I don't think so."[37]

In discussing Juror 76's fitness to serve as a juror, the trial court noted that Juror 76 had expressed discomfort with the proceedings prior to the discussion of

---

[34] RP (Sept. 23, 2015) at 833.
[35] RP (Sept. 23, 2015) at 837.
[36] RP (Sept. 23, 2015) at 837.
[37] RP (Sept. 23, 2015) at 837.

the death penalty. Counsel for Bienhoff pointed out that Juror 76 had a personal hardship that may have affected her mental state.[38] But the State specifically argued that, Juror 76 "indicated that she cannot take in the evidence and follow the Court's instructions and deliberate with her fellow jurors. So because of that, the State believes it's appropriate to strike . . . Juror Number 76 for cause."[39]

Ultimately, the trial court dismissed Juror 76, stating that, "I am not dismissing 76 on the grounds of hardship. I am dismissing 76 on the grounds that she is emotionally unable to be a juror in this case."[40]

A review of the record reveals that Juror 76 was actually dismissed based on her response to the improper discussion of the death penalty. The trial court's statement that Juror 76 was emotionally disturbed prior to the discussion of the death penalty was based on Juror 76's statement *after* the discussion had taken place. The record does not show that the trial court was considering dismissing Juror 76 as emotionally unfit to serve as a juror until after the discussion of the death penalty, and the trial court specifically stated that it was not dismissing Juror 76 on her personal hardship ground.

Therefore, two potential jurors were dismissed based on their responses to the discussion of the death penalty elicited by the prosecutor's improper conduct. The improper changing of the composition of the jury in favor of those who were comfortable with the possibility of the death penalty being imposed is highly likely to have rendered the jury more inclined to convict and punish. Thus, there is a

---

[38] RP (Sept. 23, 2015) at 848-49, 857-59.
[39] RP (Sept. 23, 2015) at 848.
[40] RP (Sept. 23, 2015) at 858.

substantial likelihood that the prosecutor's improper comments prejudiced Pierce and Bienhoff.

In sum, the prosecutor's extensive questioning was improper because it elicited a discussion of the death penalty during voir dire in this noncapital case. Further, there is a substantial likelihood that the improper comments prejudiced Pierce and Bienhoff because potential jurors that may have otherwise sat on the jury were struck on the basis of their negative responses to the death penalty discussion. Thus, we hold that the trial court abused its discretion when it failed to curtail this line of questioning during voir dire, and remand for a new trial.[41]

## Appearance of Fairness Doctrine

Pierce argues that the trial judge violated the appearance of fairness doctrine when he made a comment implying racial bias.[42] But Pierce did not object to the trial judge's comment below. "An appearance of fairness claim is not 'constitutional' in nature under RAP 2.5(a)(3) and, thus, may not be raised for the

---

[41] Pierce also argues that the State improperly struck Juror 6, who was African-American, for pretextual reasons, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), that the trial court erred during voir dire by telling the jury that the death penalty was not at issue in the present case, that the trial court erred when it sat an alternate juror without ensuring that she had been protected from outside influence, and that the trial court erred in not admonishing a juror who stated that he or she was familiar with Washington's procedure for applying the death penalty not to share that knowledge. Because we reverse and remand for a new trial due to prosecutorial misconduct during voir dire and these issues are unlikely to arise on retrial, we do not reach them.

[42] When examining the admissibility of text messages sent between Reed and a third party regarding a debt Reed owed, the judge stated, "[W]e don't have any information [about the third party], so we don't know whether he's some white guy like me making a threat or somebody who's actually, you know, more likely to be a gangster." RP (Oct. 21, 2015) at 2915. The Commission on Judicial Conduct subsequently admonished the judge. Commission on Judicial Conduct, Judicial Conduct Commission Approves Stipulation and Admonishes Judge Douglass A. North, No. 8583-F-174 (Dec. 8, 2018), https://www.cjc.state.wa.us/materials/activity/public_actions/2017/8583FinalStip.pdf (last visited May 11, 2018).

first time on appeal." In re Guardianship of Cobb, 172 Wn. App. 393, 404, 292 P.3d 772 (2012) (quoting State v. Morgensen, 148 Wn. App. 81, 90-91, 197 P.3d 715 (2008)); see also City of Bellevue v. King County Boundary Review Bd., 90 Wn.2d 856, 863, 586 P.2d 470 (1978) ("Our appearance of fairness doctrine, though related to concerns dealing with due process considerations, is not constitutionally based."). Therefore, we conclude that Pierce cannot raise this issue for the first time on appeal.

Because the other issues Pierce raises may occur on retrial, we address them in the remainder of this opinion.

### Exclusion of Evidence

Pierce argues that the trial court abused its discretion when it refused to admit several pieces of evidence.[43] We examine each piece of offered evidence in turn.

Evidence that is not relevant is not admissible. ER 402. "[E]vidence must (1) tend to prove or disprove the existence of a fact, and (2) that fact must be of consequence to the outcome of the case." Davidson v. Municipality of Metro. Seattle, 43 Wn. App. 569, 573, 719 P.2d 569 (1986); ER 401. This includes "facts which offer direct or circumstantial evidence of any element of a claim or defense." Davidson, 43 Wn. App. at 573.

---

[43] Pierce also argues that the trial court infringed his constitutional right to present a defense when it excluded the evidence at issue. But Pierce does not offer significant argument in support of his contention that the trial court's rulings violated his constitutional rights. Rather, his arguments focus on whether the trial court abused its discretion when it excluded the evidence at issue. Therefore, we examine whether the trial court abused its discretion in making its evidentiary rulings.

We review a trial court's evidentiary ruling for abuse of discretion. State v. Halstien, 65 Wn. App. 845, 849-50, 829 P.2d 1145 (1992). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. In re Det. of Duncan, 167 Wn.2d 398, 402, 219 P.3d 666 (2009). "A decision is based on untenable grounds or for untenable reasons if the trial court applies the wrong legal standard or relies on unsupported facts." Duncan, 167 Wn.2d at 403.

Violation of an evidentiary rule is not grounds for reversal unless the defendant suffered prejudice. State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). An error is not prejudicial "unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981). Further, "[t]he improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." Bourgeois, 133 Wn.2d at 403.

*Reed's Financial Situation*

Pierce argues that the trial court abused its discretion by applying the wrong legal standard to exclude certain evidence of Reed's poor financial status. Because the trial court properly exercised its discretion to admit only some evidence of Reed's financial situation, we disagree.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403.

"Evidence of poverty is generally not admissible to show motive." State v. Kennard, 101 Wn. App. 533, 541, 6 P.3d 38 (2000) (citing United States v. Mitchell, 172 F.3d 1104, 1108 (9th Cir. 1999)). But "[e]vidence concerning a defendant's bankruptcy and poor financial condition is admissible to show that the defendant was living beyond his means." Kennard, 101 Wn. App. at 540-41. In turn, evidence that the defendant was living beyond his means may be admissible to establish the defendant's motive to commit a crime if its probative value is not substantially outweighed by its potential prejudice. State v. Matthews, 75 Wn. App. 278, 283, 286, 877 P.2d 252 (1994) (holding that the trial court did not abuse its discretion when it admitted evidence of the defendant's recent bankruptcy and living beyond his means in trial for first degree murder where State's limited presentation of evidence did not make "any stigma of bankruptcy or poverty" the point of emphasis for the jury).

Here, Pierce sought to introduce evidence of Reed's financial situation before the incident in order to show that Reed intended to rob Bienhoff. Pierce offered evidence that Reed and his wife lacked steady employment, received public assistance, and maintained a lifestyle beyond their means. Pierce also sought admission of evidence that Reed pawned jewelry, attempted to prostitute his wife, and borrowed money from a third party who later threatened him.

The trial court ruled that Pierce could introduce evidence of Reed and his wife's lack of steady employment, that Reed had pawned a ring, and that Reed

19

had borrowed money from a third-party seeking repayment. The trial court admitted a pawn slip for the ring, found in Reed's van, showing that payment was due four days after the incident occurred. The trial court stated that this evidence was admissible because it demonstrated that Reed was under "enormous financial pressure" when he met Bienhoff.[44]

The trial court excluded the remainder of Pierce's offered evidence after finding that its potential prejudicial impact substantially outweighed its probative value. This included six other pawn slips for items for which payments were not due close to the time of the incident.

The trial court properly weighed the probative value of each item of evidence against its potential prejudicial impact prior to deciding whether to admit the evidence under ER 403. The trial court limited the scope of the evidence admitted on the issue of whether Reed had a financial motivation supporting his alleged intent to rob Bienhoff under ER 403. The trial court noted that the evidence could paint Reed and his wife as undesirable people in the eyes of the jury. The trial court concluded that only evidence demonstrating that Reed was under "enormous financial pressure" when he met Bienhoff was sufficiently probative to be admissible under ER 403. We conclude that the trial court properly exercised its discretion to admit only some evidence of Reed's financial situation.

*Reed's Prior Criminal Charge*

Pierce argues that the trial court erred when it denied his request to admit evidence of Reed's prior criminal behavior. The State responds that the trial court

---

[44] RP (Sept. 14, 2015) at 127-28.

properly barred the evidence as inadmissible propensity evidence under ER 404(b). We agree with the State.

"[E]vidence of prior misconduct is presumptively inadmissible." State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012).

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

ER 404(b). The admission of evidence of other crimes "depend[s] on its relevance and the balancing of its probative value and danger of unfair prejudice; the list of other purposes in the second sentence of ER 404(b) is merely illustrative." Gresham, 173 Wn.2d at 420.

To admit evidence of a person's prior acts, "the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

"The party seeking to introduce [ER 404(b)] evidence has the burden of establishing the first, second, and third elements." Gresham, 173 Wn.2d at 421.

Here, before trial, Pierce sought to admit evidence of a 2006 robbery charge against Reed. The State had charged Reed with first degree robbery based on the victim's claim that Reed threatened him with a gun and demanded money. The State's inability to find the victim resulted in the charge being dismissed without

prejudice. The trial court barred evidence of Reed's prior charge under ER 404(b) as impermissible propensity evidence.

The trial court did not err in its ruling. Pierce had the burden of establishing that evidence of Reed's prior robbery charge was admissible under ER 404(b). But he failed to prove that Reed had committed the acts underlying his 2006 robbery charge by a preponderance of the evidence. The charge was based solely on the victim's report to police and identification of Reed from a photo lineup. But the charge was not brought to trial because the victim could not be found.

Without additional evidence, the dismissed charge is insufficient to demonstrate that Reed committed the alleged robbery. Therefore, we conclude that the trial court properly denied admission of the robbery charge as impermissible propensity evidence under ER 404(b).

*Bibb's Prior Gun Ownership*

Pierce argues that the trial court abused its discretion when it did not admit evidence of Bibb's prior gun ownership. The State contends that the trial court properly excluded the evidence under ER 404(b). We agree with the State.

Evidence of prior acts is "not admissible to prove the character of a person in order to show action in conformity therewith." ER 404(b).

A defendant's previous ownership of guns may be admissible when it is circumstantial evidence connecting him or her to the particular weapons that were used in the crime at issue. See State v. Hartzell, 156 Wn. App. 918, 930-32, 237 P.3d 928 (2010) (evidence connecting the defendants to the guns used in the crime was admissible as circumstantial evidence where its probative value was not

outweighed by its prejudicial effect). But evidence that the defendant was in possession of a gun that was not used in the crime at issue may be barred as impermissible propensity evidence. State v. Freeburg, 105 Wn. App. 492, 500-01, 20 P.3d 984 (2001) (the trial court erred in admitting evidence that defendant was armed when arrested over two years after murder at issue occurred because the evidence was prejudicial and had little probative value, in part because the gun was not the one used in the murder).

Here, Pierce moved to admit evidence showing that Bibb had previously owned guns of the same caliber as those used in the incident and that he had experience with and knowledge of guns. The trial court excluded evidence of Bibb's prior gun ownership under ER 404(b), but allowed Pierce to ask Bibb whether he was armed at Woodland Park, whether he owned guns of the same caliber as those used in the incident when the incident occurred, and whether he had been able to tell if the gun that had been fired at him was a revolver or a semiautomatic.

The trial court properly determined that evidence of Bibb's prior ownership of guns of the same caliber as those used in the incident was inadmissible under ER 404(b). Bibb testified that he was not armed at Woodland Park on the day of the incident. There was no evidence at trial that Bibb had ever owned or possessed the weapons that were used during the incident.[45] Absent such evidence, Pierce cannot show that Bibb's previous gun ownership was relevant to

---

[45] Testimony at trial indicated that Lyons provided Bienhoff's group with two handguns, including a .45 caliber pistol.

the present case beyond showing that Bibb was a gun owner who participated in an incident that involved guns. Thus, evidence of Bibb's past ownership of guns constitutes impermissible propensity evidence under ER 404(b), and we conclude that the trial court did not abuse its discretion when it excluded the evidence.[46]

<u>Evidence of Consciousness of Guilt</u>

Pierce argues that the trial court abused its discretion when it admitted evidence that he assaulted Barnes while both were being held prior to trial, in violation of ER 404(b). Because the evidence was properly admitted on the issue of Pierce's consciousness of guilt, we disagree.

To admit evidence of a person's prior acts, "the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." <u>Vy Thang</u>, 145 Wn.2d at 642; ER 404(b). Evidence of prior misconduct is presumptively inadmissible, and the

___

[46] Pierce argues that the trial court should have admitted evidence of Bibb's prior gun ownership if it was relevant because defendants have a lower bar of admissibility under ER 404(b), relying on <u>State v. Jones</u>, 168 Wn.2d 713, 723-24, 230 P.3d 576 (2010) (holding that highly probative and relevant evidence of the victim's alleged consensual participation in a drug and sex party was admissible despite being barred by Washington's rape shield statute, RCW 9A.44.020, in order to protect the defendant's Sixth Amendment right to present a defense); <u>see also</u> <u>United States v. Aboumoussallem</u>, 726 F.2d 906, 911-12 (2d Cir. 1984); <u>New Jersey v. Garfole</u>, 76 N.J. 445, 452-53, 388 A.2d 587 (N.J. 1978).
This is unpersuasive. Bibb testified that he was not armed at Woodland Park on the day of the incident. Pierce's offered evidence that Bibb had owned guns of the same caliber as those used in the incident does not rise to the level of the evidence at issue in <u>Jones</u>, in which the defendant's offered evidence constituted the entirety of his defense. Pierce's citation to federal and New Jersey case law analyzing rules of evidence not at issue in the present case are both inapplicable to this case and unpersuasive in their substantive content. We reject Pierce's argument.

party offering the evidence has the burden of establishing that the misconduct occurred, the purpose for which the evidence is introduced, and the relevancy of the evidence. Gresham, 173 Wn.2d at 420-21.

Evidence may be admissible to show a defendant's consciousness of guilt as to the charged crime. State v. Norlund, 113 Wn. App. 171, 188, 53 P.3d 520 (2002). For evidence to be admissible on the issue of consciousness of guilt, it must be "sufficient so as to create a reasonable and substantive inference" that the action was taken in "reaction to a consciousness of guilt." State v. Price, 126 Wn. App. 617, 645, 109 P.3d 27 (2005).

"Conduct on the part of an accused person . . . having for its purpose the prevention of witnesses appearing and testifying at his [or her] trial is a circumstance for the jury to consider as not being likely to be the conduct of one who was conscious of his innocence." State v. Kosanke, 23 Wn.2d 211, 215, 160 P.2d 541 (1945); see, e.g., State v. Saenz, 156 Wn. App. 866, 874, 234 P.3d 336 (2010), aff'd in part and rev'd in part, 175 Wn.2d 17, 283 P.3d 1094 (2012) (evidence that defendant used sign language to threaten a witness and that witness was assaulted by other inmates who said "'word was sent over,'" assumedly by the defendant, was admissible to show consciousness of guilt).

A trial court's evidentiary rulings are reviewed for abuse of discretion. Halstien, 65 Wn. App. at 849-50.

Here, over Pierce's objection, the trial court allowed the State to admit evidence that Pierce assaulted Barnes while they were both in jail 10 months after the incident occurred. At trial, Barnes testified that Pierce assaulted him on

December 13, 2012, while both were waiting in a holding cell at the King County Courthouse prior to a court hearing. Barnes testified about his injuries and that he was placed in solitary confinement for his own safety. Two King County Courthouse guards also testified about the incident, with one describing Pierce standing over Barnes while telling Barnes to stay on the ground. The State submitted a recorded jail telephone call in which Pierce said that he knocked out Barnes because he "snitched."[47] Pierce testified that he assaulted Barnes because "[Barnes] lied" and the "opportunity presented itself."[48]

The evidence of Pierce's assault of Barnes was properly admitted under ER 404(b) to show Pierce's consciousness of guilt. The underlying act was undisputed and properly identified as evidence to show Pierce's consciousness of guilt. The trial court noted that the evidence was relevant, as Barnes's testimony that Pierce was at Woodland Park would contradict Pierce's initial alibi that he was not present at the incident.[49]

The evidence carried significant probative value to the State's case that Pierce was a participant in the incident. Barnes was prepared to testify that Pierce was at Woodland Park and to provide details of Pierce's involvement in the incident.[50] Thus, Pierce's assault on Barnes, especially coupled with his statement

---

[47] Ex. 103 (jail telephone call recording: Dec. 25, 2012; 9.42 at 2 min., 54 sec.—2 min., 55 sec.).

[48] RP (Oct. 22, 2015) at 3225.

[49] While arguing about the admissibility of the evidence, the parties discussed Pierce's alibi that he was not present at Woodland Park, although Pierce later testified about what occurred during the incident.

[50] Pierce may have also been aware that he was identified and charged with murder because of Barnes.

that Barnes "snitched" on him during the jail phone call, was highly probative on the issue of whether Pierce was motivated by a consciousness of guilt.

Further, the potential prejudice of the evidence against Pierce was insufficient to outweigh its probative value. Pierce was charged with first degree murder predicated on robbery with a firearm enhancement. The evidence against him involved a non-fatal assault. Although both involve violence toward another individual, an assault does not show propensity to commit first degree felony murder predicated on robbery. Further, the jury could weigh Pierce's statements that he assaulted Barnes because he "snitched" against his rationale that Barnes "lied" about Pierce's involvement in determining what inference to draw from the evidence. Thus, although the evidence may have prejudiced Pierce, it was insufficient to overcome the evidence's probative value.

Pierce argues that the evidence of Pierce's assault of Barnes was unfairly prejudicial because it was likely to arouse an emotional response from the jury. This is unpersuasive.

Evidence causes unfair prejudice where it "is more likely to arouse an emotional response than a rational decision by the jury." State v. Gould, 58 Wn. App. 175, 183, 791 P.2d 569 (1990). Admission of prior criminal convictions or actions may be likely to elicit such an emotional response from a jury if they involve serious criminal allegations that are unrelated to the charge at issue in the present case. See, e.g., State v. Johnson, 90 Wn. App. 54, 63, 950 P.2d 981 (1998) (trial court erred when it admitted evidence of defendant's unrelated prior rape

27

conviction in assault case where defendant offered to stipulate to the prior violent offense without naming the offense).

Here, Pierce's assault of Barnes is not the type of offense that is likely to elicit an emotional response from the jury that would override its rational decision-making capacity. Further, as discussed above, Pierce's assault was related to the underlying charge in the present case to the extent it demonstrated his consciousness of guilt. We reject Pierce's argument.

Pierce argues that the evidence of his assault was equivocal because it could either show that Pierce acted on his consciousness of guilt or that it demonstrated his frustration with being framed. Evidence of consciousness of guilt need not be unequivocal to be admissible. See Price, 126 Wn. App. at 645. As discussed above, evidence of Pierce's assault of Barnes leads to a reasonable inference that he did so based on his consciousness of guilt. The fact that it could lead to other reasonable inferences does not render the evidence inadmissible. We reject this argument.

Pierce contends that the prejudicial value of the evidence was exacerbated when the prosecutor committed flagrant and ill-intentioned misconduct by stating that he "bragged" about assaulting Barnes during closing argument.[51]

If a defendant does not object at trial, he or she waives a claim of prosecutorial misconduct unless he or she shows that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'"

---

[51] RP (Oct. 29, 2015) at 3776.

State v. Emery, 174 Wn.2d 741, 761, 278 P.3d 653 (2012) (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

Here, Pierce did not object to the prosecutor's statement that Pierce "bragged" about assaulting Barnes during argument. On appeal, Pierce has not demonstrated that a curative instruction by the trial court would not have cured the alleged misconduct. Similarly, he has not demonstrated that there is a substantial likelihood that the jury's verdict was affected by the statement. Therefore, Pierce has not carried his burden of establishing prosecutorial misconduct, and we reject this argument.

In sum, the trial court considered each of the ER 404(b) factors and properly concluded that each was satisfied. Therefore, we conclude that the trial court did not abuse its discretion when it determined that evidence of Pierce's assault of Barnes was admissible under ER 404(b) on the issue of his consciousness of guilt.

### Admission of Evidence in Violation of ER 613

Pierce argues that the trial court erred when it admitted testimony of Hiram Warrington to impeach Lyons's testimony. According to Pierce, the testimony included substantive content of two out of court conversations, and thereby violated ER 613. Because Pierce has not demonstrated that Warrington's testimony violated ER 613 or that the trial court's limiting instruction regarding the testimony was insufficient, we disagree.

ER 613 provides that, when examining a witness concerning his or her prior statement, "the court may require that the statement be shown or its contents disclosed to the witness at that time, and on request the same shall be shown or

disclosed to opposing counsel." ER 613(a). ER 613 also provides that extrinsic evidence of a witness's prior inconsistent statement is not admissible unless the witness has an opportunity to refute or explain the statement and the opposing party has an opportunity to question the witness. ER 613(b).

Here, at trial, Warrington testified that Lyons told him about the incident on the day that it occurred. He also testified that Pierce came to Lyons's house and Lyons asked him if he had gotten rid of everything. Pierce responded that he had gotten rid of everything in Carkeek Park, which was close to Lyons's house. Lyons testified that he did not meet Warrington at his house after the incident or discuss the incident with Pierce and Warrington later that week. Pierce denied discussing the incident with Lyons when Warrington was present.

Pierce has not demonstrated that Warrington's testimony about the alleged conversations violated ER 613. Pierce does not contend that he and Lyons were denied the opportunity to explain prior inconsistent statements, or that the interests of justice barred the admission of the testimony. He has not otherwise demonstrated that ER 613 bars Warrington's testimony. We reject this argument.

Pierce also argues that the trial court erred in admitting the content of Warrington's testimony because the State called Lyons for the primary purpose of admitting impeachment evidence that was otherwise inadmissible, citing State v. Lavaris, 106 Wn.2d 340, 345, 721 P.2d 515 (1986). This is unpersuasive. Lyons offered substantial testimony at trial, including that he provided the group with two guns, how Pierce became involved in the incident, and the events that transpired during the incident. Warrington's testimony only impeached Lyons's statements

30

that he did not talk with Warrington or have a conversation with Pierce with Warrington nearby following the incident. Thus, the record demonstrates that the State did not call Lyons for the primary purpose of admitting otherwise inadmissible evidence.

Pierce argues that the trial court's oral limiting instruction to the jury to only consider Warrington's testimony for the purpose of impeaching Lyons's credibility was ineffective, citing State v. Hancock, 109 Wn.2d 760, 763-64, 748 P.2d 611 (1988). In State v. Hancock, the court discussed ER 607 and prohibited the State from calling a witness for the primary purpose of admitting inadmissible evidence. 109 Wn.2d at 763-64. But the court also stated that, "if counsel wishes to restrict the jury's use of evidence, it must request an appropriate limiting instruction. We note that no such limiting instruction was requested in this case." Hancock, 109 Wn.2d at 767. Here, unlike in Hancock, the trial court gave a limiting instruction to the jury to only consider Warrington's testimony for the purpose of impeaching Lyons's testimony. Pierce's argument ignores that Hancock endorsed instructing the jury on this issue, and does not stand for the proposition that limiting instructions are ineffective. We reject this argument.

## Judicial Comment on the Evidence

Pierce argues that the trial court improperly commented on the evidence when it told the jury that Lyons made oral assertions to Warrington. Pierce contends that the trial court's limiting instruction to the jury regarding Warrington's testimony implied that the conversation occurred, where that fact was disputed at trial. Because the trial court's limiting instruction did not convey the judge's

personal opinion to the jury or inform the jury whether he believed Warrington's testimony, we disagree.

"Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. This provision prevents the jury "from being influenced by knowledge conveyed to [them] by the court as to the court's opinion of the evidence submitted." Heitfeld v. Benevolent & Protective Order of Keglers, 36 Wn.2d 685, 699, 220 P.2d 655 (1950).

"An impermissible comment is one which conveys to the jury a judge's personal attitudes toward the merits of the case or allows the jury to infer from what the judge said or did not say that the judge personally believed or disbelieved the particular testimony in question." Hamilton v. Dep't of Labor & Indus., 111 Wn.2d 569, 571, 761 P.2d 618 (1988). A court's improper comment giving its opinion may be express or implied. State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006).

The prohibition on judicial comments on the evidence is strictly applied. City of Seattle v. Arensmeyer, 6 Wn. App. 116, 120, 491 P.2d 1305 (1971). A claim of improper judicial comment implicates manifest constitutional error and may be raised for the first time on appeal. Levy, 156 Wn.2d at 719.

Appellate courts review whether an instruction amounts to a comment on the evidence de novo. State v. Butler, 165 Wn. App. 820, 835, 269 P.3d 315 (2012).

Here, Warrington testified that he had a conversation with Lyons on the day of the incident, and that he was present when Lyons and Pierce discussed the incident. Lyons denied that either conversation occurred. While Warrington was

testifying that Lyons had told him about the incident on the day it occurred, the trial court instructed the jury that "[t]estimony regarding any oral assertions made by Ray Lyons to Hiram Warrington may be considered by you only for the purpose of impeaching Ray Lyons'[s] credibility. You may not consider it for any other purpose."[52]

The trial court's limiting instruction to the jury did not constitute an impermissible judicial comment on the evidence because it did not convey the trial court's attitude toward the merits of the case or belief in Warrington's testimony to the jury. The trial court's limiting instruction directed the jury to only consider testimony regarding *any* oral assertions made by Lyons to Warrington for the purpose of impeaching Lyons's credibility. The instruction did not reference the oral assertions or otherwise remove the determination of whether the oral assertions occurred from the jury. Also, the focus of the trial court's instruction was to limit the jury's consideration of Warrington's testimony, not to establish the factual basis of that testimony.

Further, the trial court's limiting instruction did not favorably compare Warrington's credibility to that of Lyons's. Warrington's testimony was offered to impeach Lyons's testimony. The trial court's limiting instruction simply told the jury to consider his testimony for this purpose alone, rather than for the substance of Lyons's alleged statements. It did not suggest that Warrington himself was credible or that the trial court personally believed Warrington's testimony.[53]

---

[52] RP (Oct. 20, 2015) at 2783.
[53] Pierce argues that the trial court's limiting instruction improperly weighed in on Warrington's and Lyons's credibility, and thereby impugned Pierce's credibility. Pierce

Thus, the trial court's limiting instruction did not convey the court's attitudes toward the merits of the case or decide a disputed issue of fact. We conclude that the trial court's limiting instruction was not an impermissible comment on the evidence.

## Excusable Homicide Jury Instruction

Pierce argues that the trial court erred when it declined to instruct the jury on excusable homicide. Even though we have reversed his conviction on other grounds, we reach the alleged instructional issue since it may be argued again upon retrial. Because an instruction on excusable homicide was not appropriate in light of Pierce's charged crime and the parties' theories at trial, we disagree.[54]

"A defendant in a criminal case is entitled to have the jury fully instructed on the defense theory of the case." State v. Staley, 123 Wn.2d 794, 803, 872 P.2d 502 (1994). Failure to fully instruct the jury is prejudicial error. State v. Riley, 137 Wn.2d 904, 908 n.1, 976 P.2d 624 (1999).

First or second degree murder may be based on a killing that occurs in the course of and in furtherance of a felony or in immediate flight therefrom. RCW 9A.32.030(1)(c); RCW 9A.32.050(1)(b). The State must prove that the defendant had the intent required to commit the underlying felony, not the intent required to

---

does not cite to legal authority in support of his assertion that an instruction limiting the jury's consideration of evidence to the issue of witness credibility constitutes a comment on the evidence. We reject this argument. RAP 10.3(a)(6).

[54] The State first argues that Pierce cannot raise this argument on appeal because he did not submit a jury instruction on excusable homicide or otherwise take exception to the trial court's refusal to so instruct the jury. Generally, a party must request an instruction or object to its rejection to preserve the issue on appeal. State v. Scott, 110 Wn.2d 682, 685-86, 757 P.2d 492 (1988); CrR 6.15(c). Here, Bienhoff proposed the jury instruction on excusable homicide, and Pierce joined Bienhoff's exception to the trial court's rejection of the proposed instruction. We conclude that Pierce may raise this issue on appeal.

prove first or second degree murder. State v. Craig, 82 Wn.2d 777, 781-83, 514 P.2d 151 (1973). "Even if the murder is committed more or less accidentally in the course of the commission of the predicate felony, the participants in the felony are still liable for the homicide." State v. Bolar, 118 Wn. App. 490, 504, 78 P.3d 1012 (2003) (citing State v. Leech, 114 Wn.2d 700, 708, 790 P.2d 160 (1990)).

"Homicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means, without criminal negligence, or without any unlawful intent." RCW 9A.16.030.

"[A] trial court's refusal to give an instruction [to the jury] based on a ruling of law is reviewed de novo." State v. Walker, 136 Wn.2d 767, 772, 966 P.2d 883 (1998).

Here, Pierce was charged with murder in the first degree by reason of causing Reed's death while committing or attempting to commit the crime of robbery in the first degree. Pierce argued that the trial court should instruct the jury on excusable homicide with modified self-defense language.[55]

The trial court declined to instruct the jury on excusable homicide. The trial court concluded that Pierce and Bienhoff could not argue that Bienhoff lawfully used force during the incident because self-defense is not a defense to robbery. Further, the trial court noted that the jury's decision hinged on whether they found that Pierce and Bienhoff had attempted to rob Reed. If the jury determined that Pierce and Bienhoff did not attempt to rob Reed, Pierce would not be guilty of the charged crime. But if the jury determined that Pierce and Bienhoff did attempt to

---

[55] Pierce did not submit a proposed excusable homicide instruction.

rob Reed, then justifiable homicide was not available because Bienhoff's use of force was not done during a lawful act.

The trial court did not err when it declined to instruct the jury on excusable homicide. For an excusable homicide instruction to be available, Pierce would have to demonstrate that Bienhoff was acting lawfully by lawful means. A determination that Bienhoff was acting in furtherance of or with intent to commit robbery when Reed died would necessarily establish that he was not acting lawfully by lawful means. Therefore, if the State carried its burden of proving that Bienhoff caused Reed's death while he was acting furtherance of or with intent to commit robbery, an instruction on excusable homicide would be inappropriate.

Further, Pierce's theory at trial was that he and Bienhoff intended to sell Reed marijuana. Pierce claimed that Reed's death was an accident that occurred when Reed pulled out a gun during the transaction. But even if the jury determined that Pierce established his theory of the case, they would not reach the issue of whether Reed's death was an excusable homicide. Pierce was solely charged with felony murder predicated on robbery. Robbery was a necessary prerequisite for the felony murder charge.

Thus, if the jury determined that Bienhoff met Reed with the intent to sell him marijuana, rather than the intent to rob him, the State would have failed to establish the predicate felony and Pierce would have been found not guilty. Without the underlying robbery, the jury would never reach the issue of whether Bienhoff caused Reed's death. Thus, under the facts of the present case, even if

Pierce successfully argued his theory of the case at trial, the trial court did not err in declining to instruct the jury on excusable homicide.

Pierce argues that binding Washington case law requires that the jury be instructed on excusable homicide in felony murder cases where facts support the instruction. We disagree.

In State v. Brightman, the defendant was charged with premeditated first degree intentional murder and in the alternative with first degree felony murder based on robbery after he allegedly killed the victim during a car theft. 155 Wn.2d 506, 509-11, 122 P.3d 150 (2005). The Washington Supreme Court noted that the proper defense to an accidental killing is excusable homicide, not justifiable homicide as argued by the defendant at trial. Brightman, 155 Wn.2d at 513, 525-26. After reversing for an open courts violation, the Washington Supreme Court noted that, if the defendant argued on remand that he "committed an excusable homicide that was precipitated by an act of self-defense," the trial court would have to determine whether he had raised sufficient supporting evidence. Brightman, 155 Wn.2d at 526.

In State v. Slaughter, the defendant was charged with second degree intentional murder and in the alternative with second degree felony murder based on assault. 143 Wn. App. 936, 941, 186 P.3d 1084 (2008). The Court of Appeals affirmed the trial court's instruction to the jury on excusable homicide where the defendant argued that, after he and the victim struggled over possession of a crack pipe, he fatally stabbed the victim while defending himself from the victim's assault. Slaughter, 143 Wn. App. at 940-41, 944-47. The Court of Appeals noted that the

facts of the case supported the defendant's request for an excusable homicide instruction. Slaughter, 143 Wn. App. at 946-47.

The cases cited by Pierce are distinguishable from the present case. Brightman and Slaughter involved charges of intentional murder with charges in the alternative of felony murder. As discussed above, Pierce was solely charged with felony murder predicated on robbery. He was not charged with a separate violent crime that could necessitate giving an instruction on excusable homicide. Thus, neither Brightman nor Slaughter control the outcome of the present case. In light of Pierce's charged offense, the facts of the present case, and the parties' theories at trial, the jury would not reach the issue of whether Reed's death was an excusable homicide. The trial court properly declined to issue an excusable homicide instruction.

## Calculation of Offender Score

Pierce argues that the trial court miscalculated his offender score because it counted two prior nonviolent juvenile felony offenses as 1 point each, instead of 1/2 point each. Because the trial court's offender score calculation shows that it counted each of Pierce's two prior nonviolent juvenile felony offenses as 1/2 point, we disagree.

First degree murder is a serious violent offense. RCW 9.94A.030(46)(a)(i).

> If the present conviction is for a serious violent offense, count three points for prior adult and juvenile convictions for crimes in this category, two points for each prior adult and juvenile violent conviction (not already counted), one point for each prior adult nonviolent felony conviction, and 1/2 point for each prior juvenile nonviolent felony conviction.

RCW 9.94A.525(9). Assault in the second degree is a violent offense. RCW 9.94A.030(55)(viii).

Calculation of a defendant's offender score is reviewed de novo. State v. Mutch, 171 Wn.2d 646, 653, 254 P.3d 803 (2011).

Here, Pierce's criminal history included six prior adult nonviolent felony convictions, one prior adult violent conviction, and two prior juvenile nonviolent felony convictions.[56] This resulted in 6 total points for his prior adult nonviolent felony convictions, 2 total points for his prior adult violent conviction, and 1 total point for his two juvenile nonviolent felony convictions for an offender score of 9. The trial court calculated Pierce's offender score as 9. We conclude that the trial court did not err in calculating Pierce's offender score.

### Imposition of Legal Financial Obligations

Pierce argues that the trial court erred when it imposed $600 in legal financial obligations (LFOs) upon him. Because the challenged LFOs are mandatory, we disagree.

"When any person is found guilty in any superior court of having committed a crime . . . there shall be imposed by the court upon such convicted person a penalty assessment." RCW 7.68.035(1)(a). The imposed penalty "shall be five

---

[56] Pierce's prior adult nonviolent felony convictions were one count of adult residential burglary, two counts of adult possession of a stolen vehicle, one count of adult possession of stolen property, one count of adult attempt to elude pursuing police, and one count of adult theft in the second degree. Pierce's prior adult violent conviction was one count of second degree assault. Pierce's two prior juvenile nonviolent felony convictions were one count of juvenile theft in the second degree and one count of juvenile taking a motor vehicle without permission.

hundred dollars for each case or cause of action that includes one or more convictions of a felony." RCW 7.68.035(1)(a).

"Every sentence imposed for a crime specified in RCW 43.43.754 must include a fee of one hundred dollars. The fee is a court-ordered legal financial obligation as defined in RCW 9.94A.030 and other applicable law." RCW 43.43.7541. "A biological sample must be collected for purposes of [deoxyribonucleic acid (DNA)] identification analysis from: (a) Every adult or juvenile individual convicted of a felony." RCW 43.43.754. Both victim penalty assessment (VPA) and DNA collection fees are mandatory LFOs that are not subject to trial courts' discretion. State v. Mathers, 193 Wn. App. 913, 918-21, 376 P.3d 1163 (2016).

Appellate courts review questions of statutory interpretation de novo. State v. Hirschfield, 170 Wn.2d 536, 541-42, 242 P.3d 876 (2010).

Here, the trial court imposed LFOs on Pierce consisting of a $500 VPA and a $100 DNA collection fee. These LFOs are mandatory under RCW 7.68.035 and RCW 43.43.7541, regardless of indigency. Therefore, the trial court did not err when it imposed $600 in LFOs on Pierce.[57]

Pierce argues that enforcement of the LFOs would infringe his constitutional equal protection rights and his Fourteenth Amendment rights under Fuller v. Oregon, 417 U.S. 40, 45-46, 94 S. Ct. 2116, 40 L. Ed. 2d 642 (1974). Pierce's

---

[57] Pierce contends that the trial court should have waived all LFOs because he is indigent, relying on State v. Blazina, 182 Wn.2d 827, 344 P.3d 680 (2015) and related cases. This is unpersuasive. In Blazina, the court analyzed RCW 10.01.160(3), which provides that a court "shall not order a defendant to pay costs unless the defendant is or will be able to pay them." 182 Wn.2d at 839. The present case does not involve RCW 10.01.160(3). We reject Pierce's analogy to Blazina.

arguments have been previously rejected. See Mathers, 193 Wn. App. at 925-26 (rejecting equal protection and Fourteenth Amendment arguments against imposition of mandatory LFOs).[58]

Reversed and remanded for a new trial.

Trickey, J

I CONCUR:

---

[58] Pierce argues that imposition of the LFOs violated his substantive due process rights. Substantive due process challenges to DNA collection and victim penalty assessment mandatory LFOs are not ripe for review until the State attempts to impose sanctions for failure to pay the fee. State v. Shelton, 194 Wn. App. 660, 670-75, 378 P.3d 230 (2016); State v. Curry, 118 Wn.2d 911, 917-18, 829 P.2d 166 (1992); see State v. Blank, 131 Wn.2d 230, 245, 930 P.2d 1213 (1997) (holding that "it is not fundamentally unfair to impose a repayment obligation without notice and an opportunity to be heard prior to the decision to appeal, provided that before enforced payment or sanctions for nonpayment may be imposed, there is an opportunity to be heard regarding ability to pay"). Pierce has not demonstrated that the State has attempted to sanction him for failing to pay the fees, and thus his claim is not ripe for review.